Michael QUARTARARO, Plaintiff,

v.

James M. CATTERSON, District Attorney of Suffolk County; Mark Cohen, Chief Assistant District Attorney; Demetri Jones, Donald Byrnes, and Michael Miller, Assistant District Attorneys; Timothy Mazzei and William Keahon, former Assistant District Attorneys, as past and present employees of the Suffolk County District Attorney's Office; New York State Division of Parole, Paul Russi, Chairman, Martin Horn, Executive Director of the New York State Department of Parole, William K. Altschuller, Director of the Appeals Unit of the New York State Department of Parole, Patrick Hoy, Area Supervisor, Philip Deluca, and John Callender, Senior Parole Officers; Gerald Burke, Thomas Biddle, Maria Rivera Buchanan, Leo Levy, J. Kevin McNiff, Anthony Umina, Barbara Treen, Daniel Tauriello, George King, Julian Rose, Parole Commissioners, and others, as employees of the Division of Parole; the New York State Department of Correctional Services, Thomas A. Coughlin, Commissioner, James F. Recore, Director of Temporary Release Programs, Brian Fischer, Superintendent of Queensboro Correctional Facility, Enoc Esteves, Deputy Superintendent, William Lester, Senior Counselor and Temporary Release Chairman, Rudolph F. Jeffrey, Correction Counselor, as employees of the Department of Correctional Services; the New York State Commission of Correction, William G. McMahon, former Commissioner, Defendants.

No. 93–CV–4059 (JS).

United States District Court, E.D. New York.

Jan. 25, 1996.

James A. Cohen, Lincoln Square Legal Services, Inc., New York City, for Plaintiff.

Rebecca Ann Durden, Assistant Attorney General, New York State Department of Law, New York City, for State DOCS, Parole and Commission Defendants.

William H. Pauley III, Snitow & Pauley, New York City, for District Attorney Defendants Catterson, Cohen, Jones and Miller.

Garrett W. Swenson, Jr., Assistant County Attorney, Suffolk County Department of Law, Hauppauge, NY, for Former Prosecutor Defendants Byrnes, Keahon and Mazzei.

### MEMORANDUM AND ORDER

SEYBERT, District Judge:

In the instant federal civil-rights action, plaintiff Michael Quartararo, an inmate of the New York State correctional system, brings suit against the defendants alleging that they violated his federal constitutional rights through their conduct in bringing about his removal from a work release program, and in causing his parole applications to be denied. Defendants New York State Division of Parole ["Division of Parole"], Russi, Horn, Altschuller, Hoy, DeLuca, Callender, Burke, Biddle, Buchanan, Levy, McNiff, Umina, Treen, Tauriello, King, and Rose, all current or former employees of the Division of Parole [hereinafter, the "Parole Defendants"], New York State Department of Correctional Services ["DOCS"], New

York State Division of Correction ["Division of Correction"], Coughlin, Recore, Fischer, Esteves, Lester and Jeffrey, all current or former employees of DOCS [hereinafter, the "DOCS Defendants"], Catterson, Cohen, Miller and Jones, respectively the District Attorney of Suffolk County and assistant district attorneys employed by the Suffolk County District Attorney's Office at the time of the acts alleged in the plaintiff's Second Amended Complaint [hereinafter, the "District Attorney Defendants"], and Mazzei, Keahon and Byrnes, all former assistant district attorneys who were employed at one time by the Suffolk County District Attorney's Office [hereinafter, the "Former Prosecutor Defendants"], have moved to dismiss the Second Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. The Parole Defendants, DOCS and the Division of Correction also move to dismiss this action for lack of subject matter jurisdiction, pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, and further move for judgment on the pleadings, pursuant to Fed.R.Civ.P. 12(c). In addition, the plaintiff moves pursuant to Fed.R.Civ.P. 15 for leave to file a Third Amended Complaint. For the reasons that follow, the defendants' applications are granted in part and denied in part, and the plaintiff is granted leave to file a Third Amended Complaint consistent with the Court's rulings herein.[1]

## FACTUAL BACKGROUND

### A. General Background

On April 20, 1979, John Pius was brutally murdered in Smithtown, New York. John Pius's body was discovered in the woods behind Dogwood Elementary School, partially covered with leaves and with rocks in his mouth and throat. John Pius was thirteen years old at the time of his death.

In December 1979, plaintiff Michael Quartararo, his brother Peter Quartararo, and Robert Brensic were indicted by the Suffolk County Grand Jury for the murder of John

Pius. Plaintiff was fourteen years old at the time that he was indicted. Thereafter, in 1981, Thomas Ryan also was indicted for John Pius's murder. In 1981, plaintiff and his brother were tried and convicted and sentenced to prison terms of nine years to life.

Thereafter, plaintiff petitioned the United States District Court for the Eastern District of New York for a writ of habeas corpus. By decision dated February 9, 1988, the petition for habeas corpus was granted on the basis of ineffective assistance of counsel, and plaintiff was granted a new trial. *See Quartararo v. Fogg*, 679 F.Supp. 212 (E.D.N.Y.), *aff'd,* 849 F.2d 1467 (2d Cir.1988). The District Court also ordered plaintiff's release on bail pending trial. *See id.* Plaintiff remained on bail from February 1988 through February 1990.

In February 1990, plaintiff was retried and reconvicted on the original 1979 indictment, and on May 30, 1990, was sentenced once again to a term of nine years to life. Upon being resentenced, plaintiff was returned to an upstate prison in DOCS custody to serve at a minimum, the remaining two years of his minimum sentence. Plaintiff appealed this reconviction, and his appeal was denied by the Appellate Division on May 31, 1994, *see People v. Quartararo*, 200 A.D.2d 160, 612 N.Y.S.2d 635 (2d Dep't 1994), and by the New York Court of Appeals on November 1, 1994. *See People v. Quartararo*, 84 N.Y.2d 939, 621 N.Y.S.2d 536, 645 N.E.2d 1236 (1994).

### B. Work Release

After plaintiff's reincarceration, on October 21, 1991, defendants Coughlin and Recore approved plaintiff for the work release program. On January 3, 1992, plaintiff was transferred to the Queensboro Correctional Facility, located in Long Island City, Queens, New York [hereinafter, "Queensboro"], to participate in the work release program. Thereafter, plaintiff alleges, *inter alia,* that

---

1. Plaintiff has consented to retract his conspiracy claims brought pursuant to 42 U.S.C. § 1985. *See* Pl.'s Mem. of Law, at 2 n. 2. In view of the applicable law, this serves to retract his claims under 42 U.S.C. § 1986 as well. *See Gagliardi v.*

*Village of Pawling,* 18 F.3d 188, 194 (2d Cir. 1994) (To state a claim under 42 U.S.C. § 1986, a viable conspiracy claim must be set forth under 42 U.S.C. § 1985).

(a) he was singled out and questioned by defendants DeLuca, Callender and John Doe regarding his role in the Pius murder; (b) unnamed individuals leaked to the press that he was participating in the work release program; (c) the District Attorney Defendants and the Former Prosecutor Defendants engaged in activities to prevent plaintiff's release from prison; and (d) unnamed DOCS Defendants stole and destroyed his work identification cards in an effort to prevent his successful participation in the work release program by causing him to be late for work in the expectation that he would lose his job.

Plaintiff continued to participate in DOCS' work release program until January 28, 1992. On or about January 28, 1992, the Parole and DOCS Defendants were notified by defendants Catterson, Cohen, Jones and other unknown District Attorney Defendants that plaintiff allegedly had threatened Barbara Pius, the mother of the slain child. *See* Pl.'s Second Am.Compl. ¶ 72. According to plaintiff, this allegation was fabricated for the purpose of preventing his participation in the work release program and to block his release on parole. Upon being notified of this alleged threat, on January 29, 1992, plaintiff was confined to the Special Housing Unit ["SHU"] at Queensboro where he remained for a period of 14 days, until February 12, 1992. Plaintiff alleges that this confinement was punitive in nature, despite the fact that the Notice of Inmate Segregation that he received termed such confinement as "administrative." *See id.* ¶ 73; *id.* Ex. E (Notice to Inmate of Administrative Segregation). During this 14–day period, plaintiff was confined for 23 hours per day, and was denied hot water, laundry services, personal property, and visitation privileges. Plaintiff also was denied access to a law library, the inmate grievance program, and congregate religious services. *See id.* ¶ 73.

On January 30, 1992, and again on February 4, 1992, plaintiff wrote to Superintendent Fischer, seeking an explanation for his confinement to the SHU and requesting his removal from the SHU. *See id.* Ex. F. Plaintiff alleges that during this same time frame, defendant DeLuca ordered Kay Russell, plaintiff's parole officer, to write a mis-behavior report on plaintiff for violating temporary release rules. Russell refused to do so, however, because she had been prohibited from interviewing plaintiff, and prevented from investigating the nature and substance of the alleged threat to Barbara Pius.

Plaintiff alleges that at some point between January 30, 1992 and February 4, 1992, defendants Fischer, Lester, Hoy, DeLuca and others conducted a secret hearing at Queensboro concerning plaintiff's continued participation in work release. Plaintiff was not given notice of this hearing, nor was he provided with an opportunity to appear or to present evidence or witnesses on his behalf. According to plaintiff, his participation in the work release program was summarily revoked after the secret hearing. Plaintiff was not provided with a detailed statement of reasons for his removal from the work release program.

Plaintiff also alleges that the DOCS and Parole Defendants caused the inclusion, in plaintiff's parole and DOCS files, of false, misleading, inaccurate and highly prejudicial information and material, including secret reports, findings, photographs of John Pius, and other letters and documents from unverified sources. Plaintiff further alleges that he was denied access to his files.

On February 12, 1992, plaintiff appeared before a Temporary Release Committee composed of defendants Lester, DeLuca and Jeffrey. Plaintiff alleges that he was not (a) given any notice of this hearing, (b) permitted to call witnesses or present evidence on his own behalf, or (c) permitted to review DOCS and parole investigative material. Subsequent to this hearing, plaintiff was advised that his work release was being revoked based on the fact that he had been denied parole for two years. According to the plaintiff, his removal from work release was motivated entirely by the desire of defendants Coughlin, Recore, Fischer, DeLuca and Jeffrey to avoid media embarrassment in view of the publicity that had been directed to plaintiff's participation in the work release program.

Plaintiff further contends that he was treated differently than other high profile inmates who participated in the work release

program. Among other things, plaintiff directs the Court's attention to N.Y. Correction Law § 851(2), which generally permits an inmate who has been denied parole for two years to continue participation in the work release program. *See* N.Y.Correct.Law § 851(2) (McKinney Supp.1995). According to plaintiff, other inmates convicted of homicide, and denied parole for a period of two years, have been permitted to remain in this program. He therefore contends, *inter alia,* that his selective removal from the program deprived him of his right to equal protection of the law.

## C. 1992 Parole Hearing

On February 11, 1992, plaintiff appeared before a parole board panel consisting of defendant Parole Commissioners Burke, Biddle and Buchanan [the "1992 Parole Hearing"]. According to the plaintiff, prior to the hearing, defendants Hoy and DeLuca improperly communicated to the Parole Board Commissioners false and misleading information, thereby prejudicing plaintiff and preventing his release on parole. On February 12, 1992, plaintiff was advised that his request for parole was denied for two years.

Plaintiff contends that in reaching their decision, the defendant Parole Commissioners considered improper information including photographs of John Pius's body, an involuntary confession induced from Peter Quartararo, the report relating to plaintiff's threat to Mrs. Pius, numerous other letters and documents, and political pressure. Plaintiff further contends that the defendant Parole Commissioners improperly relied upon standards governing the treatment of adults when they should have relied on juvenile guidelines.

On February 12, 1992, plaintiff was transferred to an upstate facility. Thereafter, plaintiff brought a proceeding pursuant to Article 78 of the New York Civil Practice Law and Rules before the New York State Supreme Court challenging his denial of parole [the "Article 78 proceeding"]. On January 31, 1994, a decision was rendered by the New York State Supreme Court in plaintiff's favor. *See Quartararo v. New York State Div. of Parole,* No. 45734–92, N.Y.L.J. Feb. 17, 1994, at 25 (N.Y.Sup.Ct. Jan. 31, 1994) (Pl.'s Second Am.Compl.Ex. O). The state court held that defendant Parole Commissioners Burke, Biddle and Buchanan misconstrued their roles and powers by establishing penal policy in attempting to resentence the plaintiff, rather than determining whether he should be released based on the statutory factors. Accordingly, the court granted plaintiff a *de novo* parole hearing, and ordered that reference to the suppressed confession of plaintiff's brother and the initial 1981 conviction not be considered at such hearing. The court further ordered that any press reports, documentation relating to plaintiff's removal from work release, and the photographs of John Pius be removed from plaintiff's file prior to the rehearing. *See id.*

## D. Events Subsequent to February 12, 1992

On February 12, 1992, plaintiff was transferred from Queensboro to an upstate prison to continue serving his sentence. Thereafter, plaintiff's wife received two telephone calls from a woman who identified herself only as an employee at Queensboro. This woman stated that plaintiff was being treated improperly in that he was singled out for harsh treatment.

The plaintiff's wife then hired a private investigator to locate Kay Russell, plaintiff's parole officer. Upon being located, Ms. Russell confirmed the existence of photographs of the body of John Pius in plaintiff's DOCS file, and stated that she spoke on several occasions with defendant DeLuca and had been ordered by DeLuca to make plaintiff's work release experience unbearable. Russell also confirmed that a secret hearing had taken place at Queensboro from which both she and the plaintiff were excluded. Finally, Russell expressed a fear of reprisal in the event she were to come forward with information concerning the plaintiff's treatment, stating that an unnamed parole official had warned her that if she were to testify or sign an affidavit favorable to the plaintiff, her retirement would be delayed.

## E. 1994 *De Novo* Parole Hearing

In mid-February 1994, prior to plaintiff's *de novo* parole hearing, *Newsday,* a daily

newspaper, prominently reported the state court's decision granting a *de novo* hearing to the plaintiff. At or about the same time, plaintiff sought access to his parole file. This request, however, was denied by defendant Byrnes, who stated that no system exists to notify candidates for parole when information is added to or removed from their files.

On February 23, 1994, plaintiff appeared before defendant Parole Commissioners Treen and Tauriello for a *de novo* parole hearing [the "1994 *De Novo* Parole Hearing"]. Parole again was denied for two years, retroactive to February 1992, and the seriousness of plaintiff's offense was cited as the reason for the decision. *See* Pl.'s Second Am.Compl.Ex. P (Parole Board Decision Notice dated Feb. 23, 1994).

The plaintiff alleges that the parole board failed to comply with the state court's order directing the *de novo* hearing. Specifically, plaintiff alleges that: (a) prior to and during the *de novo* hearing, Treen and Tauriello reviewed a transcript of the defective 1992 hearing; (b) the Parole Defendants failed to remove from plaintiff's parole file certain materials which the state court had ordered removed, including references to the suppressed confession of plaintiff's brother, plaintiff's defective 1981 conviction, and other information; and (c) defendants Treen and Tauriello, as well as the other named Parole Defendants, in denying parole to plaintiff at this *de novo* hearing, again were improperly influenced by public and political pressure.

Plaintiff alleges that immediately following the *de novo* parole hearing, he was summoned to the basement corridor at Wallkill Correctional Facility, where he was told by Senior Parole Officer Donald Marley that his application for release on parole had been denied, because had it been granted, it would have appeared to be an admission that parole had been erroneously denied in 1992. Marley further told plaintiff that he had a "100% chance" of being paroled in March 1994 at his regularly scheduled parole hearing, provided that an out-of-state parole investigation had been completed by Massachusetts parole authorities.

Plaintiff subsequently commenced an Article 78 proceeding in the Supreme Court of New York challenging the February 23, 1994 parole hearing.

### F. 1994 Regularly Scheduled Parole Hearing

On or about March 7, 1994, the Massachusetts parole authorities approved and accepted the plaintiff's parole plan to which Marley had referred, and forwarded notice of said approval to the Parole Defendants in New York prior to the March 23, 1994 parole hearing.

On March 23, 1994, plaintiff appeared before a parole panel consisting of defendants Parole Commissioners King and Rose for his regularly scheduled parole hearing [the "March 1994 Parole Board"]. Plaintiff was denied parole based upon the seriousness of the offense and his failure to admit participation in the murder of John Pius. *See* Pl.'s Second Am.Compl.Ex. Q (Parole Board Decision Notice dated March 23, 1994).

According to the plaintiff, defendants King and Rose relied upon improper materials and information, as well as impermissible criteria, in denying plaintiff's parole application. Specifically, plaintiff alleges that although defendant King stated to plaintiff at the hearing that, because an appeal of his 1990 conviction was pending, plaintiff would not have to discuss his case, plaintiff nevertheless was questioned by King concerning the murder of John Pius. Plaintiff alleges that he was improperly pressured into not responding to these questions out of fear that anything he said might be misinterpreted or used against him at a later time.

Finally, on March 24, 1994, shortly after receiving his parole denial notice, plaintiff once again was placed in a SHU, this time upon being labeled a "threat to security." Plaintiff, however, was not issued a misbehavior report in connection with this designation. Shortly thereafter, plaintiff was reclassified, and transferred to Woodbourne Correctional Facility, a facility of higher security classification.

## DISCUSSION

### I. Standard of Review

A district court should grant a motion to dismiss under Rule 12(b) of the Federal Rules of Civil Procedure only if " 'it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.' " *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 249–50, 109 S.Ct. 2893, 2906, 106 L.Ed.2d 195 (1989) (quoting *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984)). In applying this standard, a district court must "read the facts alleged in the complaint in the light most favorable" to the plaintiff, and accept these allegations as true. *Id.* at 249, 109 S.Ct. at 2906; *see Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *see also Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 168, 113 S.Ct. 1160, 1163, 122 L.Ed.2d 517 (1993) (citing Fed.R.Civ.P. 8(a)(2) to demonstrate liberal system of "notice pleading" set up by the Federal Rules of Civil Procedure).

■■■ The foregoing standards governing a court's evaluation of a Rule 12(b) motion to dismiss are to be contrasted with another type of Rule 12 motion that some of the defendants have invoked in this action, to wit, a motion for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c). In contrast to a motion to dismiss, a motion for judgment on the pleadings requires a court to consider not only the plaintiff's complaint, but also the defendant's answer, in assessing the plaintiff's articulation of his or her claim.[2] The defendants' invocation of Rule 12(c) is misplaced, however, because this procedural device only becomes operative "[a]fter the pleadings are closed...." Fed.R.Civ.P.

12(c). Since none of the moving defendants has filed an answer in this action, Rule 12(c), by its terms, does not apply. Accordingly, to the extent that Rule 12(c) has been invoked, the defendants' applications will be recharacterized as having been brought pursuant to Rule 12(b).

### II. Eleventh Amendment Immunity

Defendants DOCS, the Division of Parole, the New York State Commission of Correction, and the individual Parole Defendants have moved to dismiss the Second Amended Complaint to the extent that they have been sued in their official capacities, on the ground that the plaintiff's complaint is barred by the Eleventh Amendment.

■■■ The Eleventh Amendment to the United States Constitution bars suit in federal court against a State, or one of its agencies or departments, unless the State has consented to be sued, or Congress has enacted legislation overriding the State's Eleventh Amendment immunity.[3] *See Papasan v. Allain*, 478 U.S. 265, 276, 106 S.Ct. 2932, 2939, 92 L.Ed.2d 209 (1986); *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 98–100, 104 S.Ct. 900, 906–08, 79 L.Ed.2d 67 (1984); *Owens v. Coughlin*, 561 F.Supp. 426, 428 (S.D.N.Y.1983) (Eleventh Amendment requires dismissal of suit brought against DOCS). Although the Eleventh Amendment by its terms does not bar federal courts from hearing suits brought against a State by its own citizens, the Supreme Court "has consistently held that an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State." *Edelman v. Jordan*, 415 U.S. 651, 662–63, 94 S.Ct. 1347, 1355, 39 L.Ed.2d 662 (1974) (citations omitted). "This

---

2. Entitled "Motion for Judgment on the Pleadings," Rule 12(c) of the Federal Rules of Civil Procedure provides as follows:

 After the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings. If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity

 to present all material made pertinent to such a motion by Rule 56.
 Fed.R.Civ.P. 12(c).

3. The Eleventh Amendment provides:

 The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.
 U.S. Const. amend. XI.

bar exists whether the relief sought is legal or equitable." *Papasan,* 478 U.S. at 276, 106 S.Ct. at 2939 (citing *Pennhurst,* 465 U.S. at 100–01, 104 S.Ct. at 907–09); *see Santiago v. New York State Dep't of Correctional Servs.,* 945 F.2d 25, 32 (2d Cir.1991) (Although plaintiff's "claim for an injunction against DOCS is not barred by the Eleventh Amendment's ban on retroactive damage actions, it too must be dismissed because it does not follow the requirement, established in *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908),[4] that a plaintiff seeking prospective relief from the state must name as defendant a state official rather than the state or a state agency directly...."), *cert. denied,* 502 U.S. 1094, 112 S.Ct. 1168, 117 L.Ed.2d 414 (1992). Thus, because the State of New York has not consented to suit in federal court, to the extent that the complaint seeks relief against DOCS, the Division of Parole, and the New York State Commission of Correction, the complaint must be dismissed.[5]

■ In addition, it is well established that "a suit seeking money damages from a State official in his official capacity is ... barred by the Eleventh Amendment...." *Allah v. Commissioner of Dep't of Correctional Servs.,* 448 F.Supp. 1123, 1125 (N.D.N.Y. 1978) (citations omitted); *see Scheuer v. Rhodes,* 416 U.S. 232, 237, 94 S.Ct. 1683, 1687, 40 L.Ed.2d 90 (1974); *Edelman,* 415 U.S. at 663, 94 S.Ct. at 1355–56. This result obtains because in an official-capacity suit against a state official, the state official is being sued merely as an agent of the State, and not in his or her own right. Therefore the State, and not the state official, is the real party at interest in the litigation, and it is upon the State treasury that damages would be imposed. *See Pennhurst,* 465 U.S. at 101–02, 104 S.Ct. at 908–09. Absent State

consent to suit, or an act of Congress overriding the State's Eleventh Amendment immunity, such result is prohibited by the Eleventh Amendment. *See Papasan,* 478 U.S. at 276, 106 S.Ct. at 2939; *Pennhurst,* 465 U.S. at 98–100, 104 S.Ct. at 906–08.

■ "On the other hand, a state official acting in his *official* capacity may be sued in a federal [court] to enjoin conduct that violates the federal Constitution, notwithstanding the Eleventh Amendment bar." *Dube v. State University of New York,* 900 F.2d 587, 595 (2d Cir.1990) (emphasis added) (citations omitted), *cert. denied,* 501 U.S. 1211, 111 S.Ct. 2814, 115 L.Ed.2d 986 (1991). Thus, to the extent that the plaintiff's complaint asserts claims for prospective injunctive relief against the individual Parole Defendants, the Eleventh Amendment does not deprive this Court of subject matter jurisdiction. *See Green v. Mansour,* 474 U.S. 64, 68, 106 S.Ct. 423, 426, 88 L.Ed.2d 371 (1985); *Pennhurst,* 465 U.S. at 102–03, 104 S.Ct. at 909; *Quern v. Jordan,* 440 U.S. 332, 337, 99 S.Ct. 1139, 1143, 59 L.Ed.2d 358 (1979); *Ex Parte Young,* 209 U.S. 123, 155–56, 28 S.Ct. 441, 452–53, 52 L.Ed. 714 (1908); *Berman Enters. v. Jorling,* 3 F.3d 602, 606 (2d Cir.1993), *cert. denied,* ── U.S. ──, 114 S.Ct. 883, 127 L.Ed.2d 78 (1994).

■ In the Second Amended Complaint, plaintiff specifically alleges that the following defendants are being sued only in their official capacities: Parole Commissioners Gerald Burke, Thomas Biddle, Maria Rivera Buchanan, Leo Levy, J. Kevin McNiff, Anthony Umina, Barbara Treen, Daniel Tauriello, George King and Julian Rose. In addition, the plaintiff specifically alleges that the remaining Parole Defendants are being sued in both their individual and official capacities. The defendants assert that to the extent that

---

**4.** In *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), the Supreme Court held that the Eleventh Amendment did not bar a suit in federal court seeking prospective injunctive relief from a state official who was threatening to enforce an allegedly unconstitutional state statute.

**5.** The Court also notes, as an alternative ground for dismissal, that the plaintiff's claims against DOCS, the Division of Parole, and the New York State Commission of Correction fail to state a

cause of action because neither a State, nor its agencies, is a "person" within the meaning of 42 U.S.C. § 1983. *See Will v. Michigan Dep't of State Police,* 491 U.S. 58, 64, 71, 109 S.Ct. 2304, 2308, 2312, 105 L.Ed.2d 45 (1989); *see also Richards v. New York State Dep't of Correctional Servs.,* 572 F.Supp. 1168, 1172 (S.D.N.Y.1983) (Because the New York State Department of Correctional Services is not a "person" within the meaning of the Civil Rights Act, it is not a proper party and a motion to dismiss must be granted).

plaintiff's claims for punitive, compensatory and nominal damages are asserted against the individual defendants in their present or past official capacities, these claims must be dismissed.

In his Memorandum of Law in opposition to the defendants' motions, the plaintiff concedes—quite appropriately in view of the foregoing legal principles—that he does not "seek money damages from any State official in his or her official capacity." Pl.'s Mem. of Law, at 5. In their reply brief, the defendants concede that they do not dispute that the individual defendants may be sued for prospective injunctive relief. *See* DOCS and Division of Parole Defs.' Reply Br., at 4 n. 3. As a result of these concessions, the defendants' sole remaining contention regarding the plaintiff's joinder of state officials in their official capacities concerns the plaintiff's failure to particularize his request for injunctive relief. Insofar as no such requirement is imposed by the liberal pleading standard of Fed.R.Civ.P. 8(a)(2), and these matters can be better addressed upon discovery, the defendants' application with respect to this contention is denied, and the parties are directed to submit a stipulation reflecting the concessions set forth in their moving papers.

■■ Finally, the parties do not dispute that the Eleventh Amendment "provides no immunity for state officials sued in their *personal* capacities." *Dube*, 900 F.2d at 595 (emphasis added) (citing *Farid v. Smith*, 850 F.2d 917, 920–23 (2d Cir.1988)); *see Hafer v. Melo*, 502 U.S. 21, 29–31, 112 S.Ct. 358, 364–65, 116 L.Ed.2d 301 (1991) (The Eleventh Amendment does not bar suits against state officials in their individual capacities.). Accordingly, to the extent that the Parole Defendants are sued in their personal capacities, the Eleventh Amendment imposes no barrier to the Court's assertion of jurisdiction over these claims.

### III. Defendants' Personal Involvement

The Parole Defendants contend that the plaintiff's claims against defendants Coughlin, Russi, Recore, Horn, Altschuller, Levy, Umina and McNiff must be dismissed because none of these defendants was personally involved in the alleged violations of plaintiff's federal constitutional rights. Similar applications asserting a lack of personal involvement are brought by the District Attorney Defendants, and by the Former Prosecutor Defendants. In addition, the Parole Defendants assert that the plaintiff improperly seeks to hold defendants Coughlin, Russi, Recore, Fischer, Horn and Altschuller liable for damages under the doctrine of *respondeat superior*, which is unavailable in actions brought under 42 U.S.C. § 1983. *See Monell v. Department of Social Servs.*, 436 U.S. 658, 691–92, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978) (A defendant's personal involvement in the alleged constitutional violation is a prerequisite to the imposition of damages.).

"It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of [monetary] damages under § 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir.1994) (internal quotations and citations omitted). A defendant may be personally involved in a constitutional deprivation in one of the following ways:

(1) The defendant may have directly participated in the infraction.

(2) A supervisory official, after learning of the violation through a report or appeal, may have failed to remedy the wrong.

(3) A supervisory official may be liable because he or she created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue.

(4) [A] supervisory official may be personally liable if he or she was grossly negligent in managing subordinates who caused the unlawful condition or event.

(5) [S]upervisory liability may be imposed where an official demonstrates "gross negligence" or "deliberate indifference" to the constitutional rights of inmates by failing to act on information indicating that unconstitutional practices are taking place.

*Wright*, 21 F.3d at 501; *see Williams v. Smith*, 781 F.2d 319, 323–24 (2d Cir.1986) (citations omitted); *McCann v. Coughlin*, 698 F.2d 112, 125 (2d Cir.1983) (holding that defendant Coughlin had actual or construc-

tive notice of unconstitutional procedures, and therefore could not escape personal responsibility).

A review of the Second Amended Complaint reveals it sufficiently to allege that each of the subject defendants, other than defendant Byrnes, either (i) directly participated in the deprivation of plaintiff's constitutional rights; (ii) exhibited "deliberate indifference" with respect to plaintiff's constitutional rights by failing to remedy the wrongful deprivation after having been notified of the deprivation; or (iii) both. At no point does the Second Amended Complaint assert liability with respect to a particular defendant on the basis of *respondeat superior.* As these concerns are comprehensively addressed in the plaintiff's memorandum of law, *see* Pl.'s Mem. of Law, at 20–24, the Court finds it unnecessary to repeat them at length in this Opinion.

With respect to several of the defendants, the vulnerability of the Second Amended Complaint lies not in the complaint's failure to allege personal involvement, but rather in its failure to establish that such personal involvement amounts to a cause of action under § 1983 that is able to withstand the defendants' personal immunity defenses. These separate concerns will be addressed at length later in this Memorandum and Order. At this point, however, the Court simply rules that the Second Amended Complaint is not deficient as to any individual defendant, other than defendant Byrnes, on the ground that such defendant's personal involvement fails to be alleged adequately.

■■■ As alluded above, the Court finds, however, that the plaintiff's Second Amended Complaint fails adequately to allege any personal involvement in a federal constitutional deprivation on the part of defendant Byrnes, one of the Former Prosecutor Defendants. In the Second Amended Complaint, Quartar-

aro alleges that defendant Byrnes, in violation of New York law, denied him access to his parole file, and told him that no system exists to notify prospective parolees when information is added or removed from their files. *See* Pl.'s Second Am.Compl. ¶ 133. This allegation fails to state a cause of action under 42 U.S.C. § 1983, because no federal rights are implicated by such conduct.[6] *See* 42 U.S.C. § 1983 (requiring that a plaintiff, under color of state law, be "depriv[ed] of any rights, privileges, or immunities secured by the Constitution and laws" of the United States); *Eagleston v. Guido,* 41 F.3d 865, 876 (2d Cir.1994) (quoting *Dwares v. City of New York,* 985 F.2d 94, 98 (2d Cir.1993)), *cert. denied,* —— U.S. ——, 116 S.Ct. 53, 133 L.Ed.2d 18 (1995). Moreover, plaintiff's bald assertion that this allegation, in and of itself, implicates the Fifth and Fourteenth Amendments of the United States Constitution is unavailing. *See* Pl.'s Second Am.Compl. ¶ 155. In this regard, the Second Amended Complaint does not specifically allege that Byrnes was part of a conspiracy to violate the plaintiff's federal constitutional rights.[7] Accordingly, because Byrnes is being sued solely in his individual capacity, *see id.* ¶ 8, and the Court is unable to discern any pendent state claim for damages against him, *see id.* ¶ 155, the Second Amended Complaint is hereby dismissed without prejudice against defendant Byrnes in its entirety.

## IV. Asserted Violation of Plaintiff's Constitutional Rights in connection with Confinement to Special Housing Unit [SHU]

■■■ The Parole Defendants and the DOCS Defendants next assert that the plaintiff's complaint should be dismissed to the extent that the Fourth, Sixth, Eighth and Tenth Causes of Action allege that plaintiff's constitutional rights were violated through his confinement to the SHU without inform-

---

**6.** The plaintiff's Proposed Third Amended Complaint fails to remedy this deficiency, because it similarly alleges that Byrnes violated a duty imposed upon him by New York law. *See* Pl.'s Proposed Third Am.Compl. ¶ 48.

**7.** To sustain a conspiracy claim under 42 U.S.C. § 1983, a plaintiff must allege "that a defendant

'acted in a wilful manner, culminating in an agreement, understanding or meeting of the minds, that violated the plaintiff's rights secured by the Constitution or the federal courts.' " *Malsh v. Austin,* 901 F.Supp. 757, 763 (S.D.N.Y. 1995) (quoting *Duff v. Coughlin,* 794 F.Supp. 521, 525 (S.D.N.Y.1992)).

ing him of his alleged threat to Barbara Pius, the mother of the slain child. In response to the plaintiff's allegation that his confinement to the SHU was punitive, these defendants direct the Court's attention to a notice attached to the plaintiff's complaint, entitled "Notice to Inmate of Administrative Segregation; Special Housing Protective Admission Consideration." *See* Pl.'s Second Am. Compl. Ex. E. According to the defendants, this Notice makes clear that the plaintiff was advised that he was being placed in administrative confinement because there was reason to believe that his behavior rendered him a threat to the community. The defendants do not contend, however, that the plaintiff was informed of the specific nature of the charges against him (i.e., his purported threat to Mrs. Pius) during the 14–day period of his confinement. Notwithstanding this deficiency, the defendants assert that regardless whether the plaintiff had a liberty interest not to be placed in a SHU for a period of 14 days, the notice and immediate opportunity to be heard with which he was provided was sufficient to satisfy due process.

In *Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), the Supreme Court, upon finding a liberty interest in administrative confinement to have been created by the state as a result of the mandatory language and concomitant substantive predicates of the prison regulations at issue, *see id.,* held that an inmate placed in administrative confinement is entitled to "some notice of the charges against him and an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation." *Id.* at 476, 103 S.Ct. at 874. A comprehensive hearing, however, is not required; rather, "[t]his due process requirement may be satisfied by 'an informal, nonadversary review of the information supporting [the inmate's] administrative confinement, including whatever statement [the inmate] wishe[s] to submit, within a reasonable time after confining him to administrative segregation.'" *Gittens v. LeFevre,* 891 F.2d 38, 41 (2d Cir.1989) (quoting *Hewitt,* 459 U.S. at 472, 103 S.Ct. at 871).

In the instant case, the notice of confinement provided to the plaintiff reads, in pertinent part, as follows:

### QUEENSBORO CORRECTIONAL FACILITY

### ADMINISTRATIVE SEGREGATION NOTICE TO INMATE
### SPECIAL HOUSING PROTECTIVE ADMISSION CONSIDERATION

To: QUARTARARDO [sic], MICHAEL 86–B–0085 Date: 1/30/92

The following information leads the staff of this facility to believe that protective admission to a special housing unit is necessary in your case.

PAROLE HAS ADVISED FACILITY ADMINISTRATION THAT THERE IS REASON TO BELIEVE THAT BEHAVIOR ON INMATE'S PART MAY HAVE CONSTITUTED A THREAT TO THE COMMUNITY.

PENDING REVIEW AND RECOMMENDATION BY PAROLE, PLACEMENT IN MINIMUM SECURITY UNIT IS NOT APPROPRIATE.

If you wish to consent to voluntary protective admission to a special housing unit, please sign in the appropriate space on the reverse of this form.

If you do not wish to consent to protective admission to a special housing unit, please provide the Interviewer with any statement you wish to make concerning the above information. You may also present immediately in writing any explanation or information which you want to be considered by the Superintendent in regard to this matter. Any statement you make may not be used against you in a criminal proceeding.

The Superintendent will review the above information and any statement you wish to submit and make a determination concerning your assignment. You will be notified.

Pl.'s Second Am.Compl.Ex. E. The plaintiff refused to execute the consent to confinement indicated in the form. The plaintiff contends that during the period of his confinement to the SHU, he was not notified of the precise nature of the charges against

him, despite his repeated objections to confinement, and his inquiries concerning the reasons for his confinement.

Although the above notice informed the plaintiff that he was a threat to the community, there is no indication therein of the nature of the charges against the plaintiff, namely, that he allegedly threatened John Pius's mother. In view of the deficiency in meaningful information concerning the charges against him as set forth in the notice, it is difficult to imagine that the plaintiff should have known, solely on the basis of the notice provided to him, of the nature of the charges that resulted in his confinement to the SHU. This absence of information takes on additional significance in view of the plaintiff's allegations—which the Court must accept as true for purposes of the instant motions to dismiss—that although the complaint labelled plaintiff's confinement as administrative segregation, his confinement was in fact punitive. With respect to the process due prisoners facing disciplinary charges, the Second Circuit Court of Appeals has stated:

> [A]n inmate who is facing prison disciplinary charges that could result in punitive segregation is entitled, at a minimum, to advance written notice of the charges against him and of the evidence available to the factfinder. He must be permitted to marshal the facts and prepare his defense. A written record of the proceedings must be kept. The inmate must be allowed to call witnesses and present documentary evidence in his defense.

*Patterson v. Coughlin,* 761 F.2d 886, 890 (2d Cir.1985), *cert. denied,* 474 U.S. 1100, 106 S.Ct. 879, 88 L.Ed.2d 916 (1986). The inadequacy of notice, therefore, would have the effect of depriving the plaintiff of the ability to present a meaningful defense, thereby negating much, if not all, of the procedural protections that such notice purported to provide. *See Wolff v. McDonnell,* 418 U.S. 539, 558, 94 S.Ct. 2963, 2976, 41 L.Ed.2d 935 (1974). Thus, assuming that the plaintiff possessed a liberty interest in not being confined to the SHU for a period of fourteen days, the plaintiff would succeed in stating an independent cause of action with respect to such confinement.[8] *See Wright v. Smith,* 21 F.3d 496, 499 (2d Cir.1994); *McCann v. Coughlin,* 698 F.2d 112, 121 (2d Cir.1983) (confinement to a SHU for seven days as a punishment triggers right to some due process protection, as does confinement to quarters for 14 days as a punishment); *see also Walker v. Bates,* 23 F.3d 652, 659 (2d Cir. 1994) (absent showing of good reason for denial of request to call witnesses at disciplinary hearing, fact that prisoner was successful on administrative appeal did not bar his claim for relief under § 1983), *cert. denied,* —— U.S. ——, 115 S.Ct. 2608, 132 L.Ed.2d 852 (1995); *Patterson,* 761 F.2d at 892 (placement of prisoner in SHU without prior hearing violates due process notwithstanding availability of post-deprivation remedy; this was so because question of fact existed as to whether the decision to place plaintiff in the SHU was made by officials with final authority over that decision, and therefore did not constitute a random and unauthorized act).

■■■■ Having addressed the deficiencies in the procedural safeguards afforded to the plaintiff, the Court observes that much has changed in procedural due process jurisprudence during the past several months. As recently as June of 1995, the law of the Second Circuit was that an inmate has a liberty interest in not being placed in a SHU, so as to trigger the procedural protections of due process. *See Wright,* 21 F.3d at 499 (citing *Matiyn v. Henderson,* 841 F.2d 31 (2d Cir.), *cert. denied,* 487 U.S. 1220, 108 S.Ct. 2876, 101 L.Ed.2d 911 (1988)). On June 19, 1995, much of the jurisprudential landscape was leveled in light of the Supreme Court's decision in *Sandin v. Conner,* —— U.S. ——, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995).

In *Sandin,* a prisoner, who was serving an indeterminate sentence of 30 years to life in a Hawaii prison, brought a civil-rights action against prison officials alleging that the defendants deprived him of procedural due process when an adjustment committee refused to allow him to present witnesses during a disciplinary hearing, and then sentenced him

---

**8.** In view of the inadequacy of the notice provided, the Court regards the same result to obtain if the plaintiff's confinement to the SHU is considered administrative, as opposed to punitive.

to *disciplinary* segregation in the Special Holding Unit, for a period of 30 days, for misconduct. *See Sandin,* ____ U.S. at ____, 115 S.Ct. at 2296. The Supreme Court held that neither the state prison regulations nor the Due Process Clause itself afforded the plaintiff a protected liberty interest that would entitle him to the procedural protections set forth in *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). *See Sandin,* ____ U.S. at ____, 115 S.Ct. at 2302.

In developing its analysis, the *Sandin* Court first noted that, under *Wolff,* States may in certain circumstances create liberty interests which are protected by the Due Process Clause. *See Sandin,* ____ U.S. at ____, 115 S.Ct. at 2300. These interests, however, generally will be "limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless *imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Id.* (citations omitted) (emphasis added). According to the *Sandin* Court, the methodology used in *Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), and later cases had impermissibly shifted the focus of the liberty interest inquiry from one based on the nature of the deprivation to one based on the language of a particular regulation. Under *Hewitt*'s methodology, prison regulations had been examined solely to see whether mandatory language and substantive predicates created an enforceable expectation that the State would produce a particular outcome with respect to the conditions of the prisoner's confinement. *See Sandin,* ____ U.S. at ____ ____, 115 S.Ct. at 2298–99. This methodology, in turn, led courts, such as the Ninth Circuit Court of Appeals—which the Supreme Court overturned in *Sandin*—to find liberty interests to be created through the negative implications of mandatory language. *See id.* at ____, 115 S.Ct. at 2300. In the view of the *Sandin* Court, this approach produced the undesirable effects of "creat[ing] disincentives for States to codify prison management procedures," and promoting "the involvement of federal courts in the day-to-day management of prisons...." *Id.* at ____, 115 S.Ct. at 2299.

For the foregoing reasons, the *Sandin* Court regarded the approach of *Hewitt,* both in its formulation and in its consequences, to be at variance with an analysis designed to assess the "nature" of the deprivation worked upon the inmate. *See id.* at ____, 115 S.Ct. at 2298 (citing *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972); *Board of Regents v. Roth,* 408 U.S. 564, 571, 92 S.Ct. 2701, 2706, 33 L.Ed.2d 548 (1972)). Focusing instead upon the nature of the 30 days' disciplinary confinement imposed upon the inmate in relation to his overall prison environment, the *Sandin* Court concluded that "Conner's discipline in segregated confinement did not present the type of atypical, significant deprivation in which a state might conceivably create a liberty interest." *Sandin,* ____ U.S. at ____, 115 S.Ct. at 2301.

As Justice Ginsburg aptly notes in her dissent, the majority opinion in *Sandin* leaves "consumers of the Court's work at sea ... to fathom what would constitute an 'atypical, significant deprivation,' and yet not trigger protection under the Due Process Clause directly." *Sandin,* ____ U.S. at ____ n. 2, 115 S.Ct. at 2303 n. 2 (Ginsburg, J., dissenting) (internal citations omitted). While jurisprudential uncertainty would appear to be unavoidable, certain themes do nevertheless emerge to guide lower courts in their application of the *Sandin* standard. First, in order for a deprivation to impose an atypical, significant hardship on the inmate relative to the ordinary incidents of prison life, it appears that a court must evaluate whether the deprivation is consistent with the prisoner's sentence, in the sense of being reasonably foreseeable therewith, and not unexpected, as opposed to working a "major disruption" in the prisoner's environment. *Sandin,* ____ U.S. at ____, 115 S.Ct. at 2301. In making this evaluation, a court should proceed objectively, taking into account the duration of the prisoner's sentence, the conditions to which the prisoner is subjected, and the extent to which the alleged loss of liberty portends a departure from the circumstances faced by other "inmates in the general population."

*Id.* at ——, 115 S.Ct. at 2301; *see id.* at —— n. 9, 115 S.Ct. at 2301 n. 9 ("[W]e do not think a prisoner's subjective expectations dispositive of the liberty interest analysis, [although] it does provide some evidence that the conditions suffered were expected within the contour of the actual sentence imposed.").

Second, it does not appear that the majority in *Sandin* intended to depart entirely from a consideration of whether the state statute or regulation at issue is mandatory in character. While it is clear that *Sandin* rejects the drawing of negative inferences from the mandatory language of prison regulations, *see id.* at ——, 115 S.Ct. at 2300,[9] the Court cited with approval *Meachum v. Fano*, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976), which distinguished the Court's prior decision in *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), noting that in *Wolff* "the protected liberty interest in good time credit had been created by state law; [in *Meachum*, in contrast], no comparable Massachusetts law stripped officials of the discretion to transfer prisoners to alternate facilities 'for whatever reason or for no reason at all.'" *Sandin*, —— U.S. at ——, 115 S.Ct. at 2297 (quoting *Meachum*, 427 U.S. at 228, 96 S.Ct. at 2540). Thus, it would appear that the methodology of *Sandin* did not seek to abandon entirely consideration of whether the state statute or regulation at issue, through its use of mandatory language and accompanying substantive predicates, served to strip officials of discretion in reaching their decision. Rather, the *Sandin* Court suggests that considerations of language remain relevant, although not of itself dispositive, and moreover, that the use of negative implication jurisprudence will no longer be permitted. Ironically, it therefore follows that, in certain instances, language which at first blush seems mandatory—that when dissected in tandem with the accompanying substantive predicates, previously had been construed by the courts to provide sufficient discretion to officials to prevent the creation of a liberty interest—now may trigger a liberty interest through a less technical reading under the *Sandin* analysis, provided that the resulting deprivation works an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at ——, 115 S.Ct. at 2300.

Applying the *Sandin* analysis to the facts of this case, it is clear to the Court that even if Quartararo's confinement to the SHU for a period of 14 days were regarded as punitive, such confinement, in and of itself, in view of the 9 years to life duration of plaintiff's sentence, "did not present the type of atypical, significant deprivation in which a state might conceivably create a liberty interest."[10] *Sandin*, —— U.S. at ——, 115 S.Ct. at 2301. The Court observes that this determination is consistent with the weight of authority that has applied *Sandin*. *See, e.g., Auburn Inner City Prison Branch v. Coughlin*, No. 94–2720, 1995 WL 746638, at *1 (2d Cir. Dec. 14, 1995) (unpublished disposition) (citing *Sandin* for proposition that prisoner's constitutional rights were not violated as a result of 60 days' disciplinary confinement to a SHU); *Hutchinson v. Adorno*, No. 94–2652, 1995 WL 737493, at *1–*2 (2d Cir. Dec. 13, 1995) (unpublished disposition) (71 days' segregated confinement did not impose an atypical and significant hardship on prisoner in relation to the ordinary incidents of prison life); *Carter v. Carriero*, 905 F.Supp. 99, 104

**9.** In *Sandin,* the decision of the Ninth Circuit Court of Appeals that the Supreme Court overturned had found the prisoner to possess a liberty interest in remaining free from disciplinary segregation. The Court of Appeals based its conclusion upon a prison regulation that instructs the adjustment committee to find guilt when a charge of misconduct is supported by substantial evidence. Reasoning that the committee's duty to find guilt was nondiscretionary, the Court of Appeals drew a negative inference from the language of the regulation that the committee may not impose segregation if it does not find substantial evidence of misconduct. The Court of Appeals further regarded this negative implica-tion to constitute a state-created liberty interest that entitled the prisoner to call witnesses in support of his position. *See Sandin,* —— U.S. at ——–——, 115 S.Ct. at 2296–97.

**10.** The *Sandin* analysis applies retroactively to the case at bar in accordance with general principles of construction that favors applying judicial decisions retroactively. *See Solem v. Stumes,* 465 U.S. 638, 642, 104 S.Ct. 1338, 1341, 79 L.Ed.2d 579 (1984); *see also Uzzell v. Scully,* 893 F.Supp. 259, 263 n. 8 (S.D.N.Y.1995) (noting that presumption against statutory retroactivity does not apply to judicial decisions).

(W.D.N.Y.1995) (270 days' disciplinary confinement in SHU does not impose an atypical and significant hardship in relation to the ordinary incidents of prison life, and therefore does not trigger a liberty interest); *Schmelzer v. Norfleet,* 903 F.Supp. 632, 634–35 (S.D.N.Y.1995) (11 days' confinement in keeplock does not implicate liberty interest under *Sandin* ); *Malsh v. Austin,* 901 F.Supp. 757, 761 (S.D.N.Y.1995) (rescheduling of routine dental appointment does not impose an atypical or significant hardship on a prisoner so as to give rise to a liberty interest); *Maguire v. Coughlin,* 901 F.Supp. 101, 106 (N.D.N.Y.1995) (transfer of prisoner among and within four correctional facilities in the span of three weeks does not implicate a protected liberty interest); *Cody v. Jones,* 895 F.Supp. 431, 441 (N.D.N.Y.1995) (applying *Sandin,* no liberty interest triggered through failure of prison regularly to accord plaintiff (i) one hour of daily outdoor exercise for a period of several months, (ii) two meals out-of-cell per day for a period of 32 days, or (iii) three hours out-of-cell time per day for a period of 32 days); *Eastman v. Walker,* 895 F.Supp. 31, 35 (N.D.N.Y.1995) (4 days' administrative confinement does not implicate liberty interest under *Sandin* ); *Uzzell v. Scully,* 893 F.Supp. 259, 262–63 (S.D.N.Y. 1995) (placement of plaintiff in keeplock does not implicate a liberty interest under *Sandin* ); *Brooks v. Di Fasi,* No. 93–CV–0197E(H), 1995 WL 780976, at *5 (W.D.N.Y. Dec. 29, 1995) (180 days' disciplinary confinement in a SHU does not implicate a liberty interest under *Sandin* ); *Jermosen v. Coughlin,* No. 81–CV–0974E(M), 1995 WL 780978, at *3 (W.D.N.Y. Dec. 29, 1995) (confinement to cell for 7 days, and loss of certain privileges for 30 days, fails to implicate liberty interest under *Sandin); Rosario v. Selsky,* No. 94 Civ. 6872 (MBM), 1995 WL 764178, at *5 (S.D.N.Y. Dec. 28, 1995) (less than three months' segregated confinement failed to implicate liberty interest under *Sandin* ); *Tulloch v. Coughlin,* No. 91–CV–0211E(M), 1995 WL 780970, at *2 (W.D.N.Y. Dec. 22, 1995) (180 days' disciplinary confinement in SHU does not implicate liberty interest under *Sandin* ); *Arce v. Walker,* 907 F.Supp. 658, 661–63 (W.D.N.Y.1995) (confinement to SHU for 19 days, and accompanying loss of exercise privileges, fails to implicate liberty interest under *Sandin* ); *Martin v. Mitchell,* No. 92–CV–716, 1995 WL 760651, at *3 (N.D.N.Y. Nov. 24, 1995) (30 days' confinement in keeplock fails to implicate liberty interest under *Sandin* ); *Jackson v. Keane,* No. 93 Civ. 6453 (JFK), 1995 WL 622593, at *3 (S.D.N.Y. Oct. 24, 1995) (14 days' confinement, without more, under *Sandin,* does not constitute an atypical and significant hardship implicating a constitutionally protected liberty interest); *McMiller v. Wolf,* No. 94–CV–0623E(F), 1995 WL 529620, at *1–*3 (W.D.N.Y. Aug. 28, 1995) (confinement to SHU for 183 days as a result of alleged filing by prison official of false misbehavior report fails to implicate liberty interest under *Sandin* ); *Kozlek v. Papo,* No. 94 Civ. 1429 (DAB), 1995 WL 479410, at *1–*2 (S.D.N.Y. Aug. 11, 1995) (liberty interest not triggered as a result of prisoner's confinement for 10 days to a SHU); *see also Rodriguez v. Phillips,* 66 F.3d 470, 480 (2d Cir.1995) (not reaching question of whether prisoner's three-day detention in administrative segregation implicated a liberty interest, but noting that "*Sandin* may be read as calling into question the continuing viability of our cases holding that New York regulations afford inmates a liberty interest in remaining free from administrative segregation"); *compare Delaney v. Selsky,* 899 F.Supp. 923, 927–28 (N.D.N.Y.1995) (material question of fact as to whether 197 days' confinement to SHU implicated protected liberty interest, where the inmate alleged that the conditions of his cell caused him to sustain back problems as a result of his unusual height).

The question arises whether the plaintiff in the present action nevertheless may claim a liberty interest in his confinement to a SHU for a period of 14 days on the basis that this deprivation necessarily affected his application for release on parole. This question springs from the fact that, in attempting to provide guidance to the lower courts, the *Sandin* Court noted that in certain instances, an otherwise innocuous deprivation may result in the erosion of a liberty interest in view of the proliferated rights. at stake. Specifically, the *Sandin* majority implied that a liberty interest might be impli-

cated "where the State's action will inevitably affect the duration of [the prisoner's] sentence." *Sandin,* —— U.S. at ——, 115 S.Ct. at 2302. Thus, in the view of the *Sandin* Court, had the regulations at issue *"require[d]* the parole board to deny parole in the face of a misconduct record or to grant parole in its absence," a state-created liberty interest may have been implicated. *Id.* (emphasis added). This, however, was not the case in *Sandin,* because under the Hawaiian parole statutes at issue, "[t]he decision to release a prisoner rests on a myriad of considerations." *Id.* Accordingly, the possibility that "a finding of misconduct [would] alter the balance [of factors that the parole board was required to consider was] simply too attenuated" to entail a deprivation sufficient to establish a liberty interest. *Id.*

In the instant case, while the plaintiff, noting the results of his Article 78 proceeding, *see Quartararo v. New York State Div. of Parole,* No. 45734–92, N.Y.L.J. Feb. 17, 1994, at 25 (N.Y.Sup.Ct. Jan. 31, 1994) (Pl.'s Second Am.Compl.Ex. O), claims that documentation relating to his removal from work release was improperly placed in his parole file, the Court does not regard the specific instance of his alleged disciplinary segregation to have *necessarily resulted* in his denial of parole. Accordingly, this analysis may not be employed to give rise to a liberty interest in plaintiff's confinement to the SHU. Indeed, as was the case with the parole regulations at issue in *Sandin,* nothing in New York's statutory scheme *requires* the parole board to deny parole in the face of a misconduct record, or to grant parole in its absence, even though misconduct is by regulation a relevant consideration. Moreover, under section 259–i[2][c] of the New York Executive Law, the parole board is bound to consider several factors, including the inmate's institutional record and record of accomplishments, his or her performance in a temporary release program, and the inmate's plans upon release. *See* N.Y.Exec.Law § 259–i[2][c] (McKinney 1993 & Supp.1996); N.Y.Comp.Codes R. & Regs. tit. 9 [hereinafter, 9 NYCCRR], § 8002.3(a) (1995). Where the inmate's minimum period of incarceration has been set by the Court, rather than previously by the parole board, consideration must

also be given to such factors as the seriousness of the offense, the type and length of sentence, the recommendations of the sentencing court and prosecuting attorney, as well as those of the inmate's attorney and the pre-sentencing probation report, and the inmate's prior criminal record. *See* N.Y.Exec. Law §§ 259–i[1][a] (McKinney 1993), 259– i[2][c] (McKinney 1993 & Supp.1996). Consideration is also required of statements provided by the closest surviving relative of a deceased victim. *See id.* § 259–i[2][c][v] (McKinney 1993 & Supp.1996). The statutory scheme does not specify how much weight is to be accorded to any given factor in relation to another. *See McKee v. New York State Bd. of Parole,* 157 A.D.2d 944, 550 N.Y.S.2d 204, 205 (3d Dep't 1990); *Quartararo v. New York State Div. of Parole,* No. 45734–92, N.Y.L.J. Feb. 17, 1994, at 25 (N.Y.Sup.Ct. Jan. 31, 1994) (Pl.'s Second Am. Compl.Ex. O). Accordingly, viewed against this statutory backdrop with respect to which no single factor is determinative, the Court concludes that, under *Sandin,* the portion of the plaintiff's claim that derives specifically from his confinement to a SHU for a period of fourteen days fails to implicate a liberty interest. *See Alley v. Boyles,* 65 F.3d 166, No. 94–6738, 1995 WL 522563, at *1 (4th Cir. Sept. 6, 1995) (unpublished disposition) (Disciplinary segregation that *potentially* may adversely affect prisoner's parole opportunities fails to give rise to liberty interest under *Sandin* ); *Eastman v. Walker,* 895 F.Supp. 31, 35 (N.D.N.Y.1995) ("There is no reason to believe that administrative segregation will significantly [affect] an inmate's parole opportunities."); *see also Orellana v. Kyle,* 65 F.3d 29, 32 (5th Cir.1995) (Although challenges to parole may give rise to liberty interest under *Sandin,* no such liberty was implicated in view of the language of the Texas parole statute at issue), *cert. denied,* —— U.S. ——, 116 S.Ct. 736, 133 L.Ed.2d 686 (1996); *Allen v. Steen,* No. 94– CV–0277E(H), 1995 WL 643846, at *4 (W.D.N.Y. Oct. 19, 1995) (no liberty interest implicated through alleged placement of false information in prison files, even though prisoner alleged that such reasonably would result in his denial of parole, because New York's parole provisions do not create a lib-

erty interest in parole) (quoting *Washington v. White*, 805 F.Supp. 191, 193 (S.D.N.Y. 1992)).

■ Finally, at oral argument, plaintiff's counsel contended that the plaintiff's confinement to a SHU itself implicates a liberty interest under *Sandin*, because in view of plaintiff's prior participation in a work release program, this confinement *did* amount to a deprivation of real substance that imposed an atypical and substantial hardship upon him in relation to the ordinary incidents of the prison life to which he had become accustomed. This argument is not without appeal. However, it strikes the Court that this contention, when dissected, does not assail the incidence of plaintiff's confinement to a SHU, in and of itself, as the source of a significant and atypical hardship upon him. Rather, the essence of this argument is that plaintiff's removal from the work release program caused a major disruption in his environment. It therefore follows that his confinement to a SHU for 14 days is properly regarded as a consequence, or an *injury*, flowing from his removal from work release. Viewed in this light—not as the actual deprivation, but as a resulting injury—plaintiff's placement in a SHU *could* be compensable in damages, notwithstanding the fact that it fails to rise to the level of a constitutional deprivation of its own force.

The above analysis necessarily raises the question of whether, under *Sandin*, plaintiff's removal from the work release program implicated a liberty interest. Under a pre-*Sandin* analysis, the answer to this question would be clear; for the Second Circuit Court of Appeals, in *Tracy v. Salamack*, 572 F.2d 393, 396 (2d Cir.1978) (per curiam), held that the State of New York, in establishing the Temporary Release Program, created a liberty interest that may not be terminated without an individualized due process hearing. *See Severino v. Negron*, 996 F.2d 1439, 1442 (2d Cir.1993) (per curiam) ("[I]t has

been clear since *Tracy* that a liberty interest exists [in an inmate's continued participation] in a work release program...."); *see also Klos v. Haskell*, 48 F.3d 81, 88 (2d Cir.1995) (holding that no hearing is required prior to inmate's removal from "shock incarceration program," and distinguishing *Tracy* in view of State's ambiguity in conveying extent of prison officials' discretion with respect to inmates' continued participation in the Temporary Release Program). This due process hearing must entail an "independent, good faith evaluation [manifesting] a reviewable exercise of discretion ... which ... must be accompanied by a written statement of reasons." *Tracy*, 572 F.2d at 397.

The parties do not bring to the Court's attention, and the Court's research fails to disclose, any decision of the Second Circuit Court of Appeals that addresses the continued vitality of *Tracy* in light of *Sandin*.[11] While this Court in a recent decision assumed, without explication, that *Tracy* continues to be good law, *see Hollingsworth v. Robinson*, 901 F.Supp. 565 (E.D.N.Y.1995), the Court now expressly holds that it regards this to be the case. Indeed, it impresses the Court that the removal of a prisoner from a work release program in which he has been gainfully employed imposes an atypical, significant hardship upon the prisoner relative to the ordinary incidents of prison life, and constitutes a substantial disruption of his environment. For this reason, the Court concludes that although the plaintiff fails to allege a liberty interest of its own force in connection with his confinement to the SHU, such confinement nevertheless may be compensable in damages to the extent it constitutes a manifestation of injury attributable to a liberty interest implicated through his removal from a work release program. Because the Court has determined that the notice provided to the plaintiff concerning his removal from the work release program and placement in the SHU was inadequate, *see*

---

11. In *Allen v. Steen*, No. 94–CV–0277E(H), 1995 WL 643846, at *4 (W.D.N.Y. Oct. 19, 1995), the court concluded that the denial of an inmate's application to participate in a work release program is not protected under *Sandin* because denial of such participation does not impose an atypical and significant hardship upon the pris-

oner in relation to the ordinary incidents of prison life. This determination, however, does not implicate *Tracy* because, in contrast to the circumstances in *Allen*, in *Tracy*, prisoners who were already participating in such program were removed therefrom without being accorded an opportunity to be heard.

*supra,* the Second Amended Complaint therefore succeeds in stating a cause of action concerning the deprivation of this *Tracy* interest without due process of law.

## V. Preclusion of Claims by Res Judicata or Collateral Estoppel

The Parole Defendants move to dismiss, on the grounds of res judicata or collateral estoppel, certain of the plaintiff's claims that either were or could have been presented at an Article 78 Proceeding. In this Article 78 proceeding, which was commenced in 1992, the plaintiff challenged the parole board's determination denying him parole. Specifically, the defendants contend that to the extent injunctive or declaratory relief is sought, the following three claims are barred by the doctrine of res judicata: (1) plaintiff's claim that his constitutional rights were violated when the parole board required him to admit guilt prior to being granted parole; (2) plaintiff's claim that the defendants are required to utilize the internal juvenile parole guidelines in reaching their decision on whether to grant plaintiff parole; and (3) plaintiff's claim that N.Y. Executive Law § 251–i is unconstitutional, as applied to him. The Parole Defendants also assert that to the extent the first two claims stated above seek damages, they are barred by the doctrine of collateral estoppel. The Court will address each of these theories in turn.

### A. *Res Judicata*

■■■■ Under the Full Faith and Credit Clause of the Constitution, U.S. Const. art. IV, § 1, a federal court must give the same preclusive effect to a state court judgment "as would be given that judgment under the law of the State in which the judgment was rendered." *Migra v. Warren City Sch. Dist.,* 465 U.S. 75, 81, 104 S.Ct. 892, 896, 79 L.Ed.2d 56 (1984); *see* 28 U.S.C. § 1738 (implementing the Full Faith and Credit Clause). New York courts have adopted the "transactional approach" to res judicata, or claim preclusion, "holding that if claims arise out of the same 'factual grouping' they are deemed to be part of the same cause of action and the later claim will be barred without regard to whether it is based upon different legal theories or seeks different or additional relief." *Davidson v. Capuano,* 792 F.2d 275, 278 (2d Cir.1986) (citing *Smith v. Russell Sage College,* 54 N.Y.2d 185, 192–93, 445 N.Y.S.2d 68, 71, 429 N.E.2d 746, 749 (1981); *O'Brien v. City of Syracuse,* 54 N.Y.2d 353, 357, 445 N.Y.S.2d 687, 688, 429 N.E.2d 1158, 1159 (1981); *Reilly v. Reid,* 45 N.Y.2d 24, 27, 407 N.Y.S.2d 645, 647, 379 N.E.2d 172, 174 (1978)). This bar applies not only to claims actually litigated in a prior proceeding, but also to claims that could have been litigated there. *See Balderman v. U.S. Veterans Admin.,* 870 F.2d 57, 62 (2d Cir. 1989); *Fay v. South Colonie Cent. Sch. Dist.,* 802 F.2d 21, 29 (2d Cir.1986); *Smith v. Russell Sage College,* 54 N.Y.2d 185, 192–93, 445 N.Y.S.2d 68, 71, 429 N.E.2d 746, 749 (1981).

■■■■ This bar against later claims based upon the same cause of action is, however, subject to certain limitations, one of which is that it will not be applied if the initial forum did not have the power to award the full measure of relief sought in the subsequent litigation. *See Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994); *Davidson,* 792 F.2d at 278. Thus, as the defendants concede, to the extent that the plaintiff asserts claims *for damages* under 42 U.S.C. § 1983, res judicata is inapplicable because damages for civil rights violations are generally not available in an Article 78 proceeding. *See Davidson,* 792 F.2d at 278.

■■■■ This limitation upon the res judicata effect of a claim presentable in an Article 78 proceeding does not apply, however, to claims for injunctive or declaratory relief, because these remedies may be obtained in an Article 78 proceeding. *See Fay,* 802 F.2d at 30 (Although plaintiff was not barred from pursuing § 1983 claims for damages in federal court, he was barred from litigating his equitable claims because he "could have litigated his claims for injunctive relief in the Article 78 proceeding...."). In addition, "the question of whether [a] statute has been applied in an unconstitutional fashion may be raised directly in an Article 78 proceeding." *CECOS Int'l, Inc. v. Jorling,* 895 F.2d 66, 71 (2d Cir.1990) (citing *Kovarsky v. Housing & Dev. Admin.,* 31 N.Y.2d 184, 191, 335 N.Y.S.2d 383, 286 N.E.2d 882 (1972)); *see Gargiul v. Tompkins,* 790 F.2d 265, 271–72

(2d Cir.1986) (plaintiff required to bring both available constitutional challenges in single Article 78 proceeding). Thus, despite its general inapplicability to damages claims attributable to a constitutional violation, res judicata may yet apply to those phases of a claim for which relief was available in the Article 78 forum. *See Burka v. New York City Transit Auth.*, 32 F.3d 654, 658 (2d Cir.1994) (Res judicata applies to the extent that the initial Article 78 forum had the power to award the relief sought in the federal court action.).[12]

■ Turning now to address the specific claims at issue, in the prior Article 78 proceeding before the New York State Supreme Court, New York County, plaintiff challenged the 1992 parole board determination denying him parole and argued, *inter alia*, that the parole board (1) applied the wrong guidelines to his case by failing to apply its own "juvenile offender" guidelines; and (2) gave undue weight to his continuing refusal to express remorse for his role in the death of John Pius. With respect to each claim, the state court ruled, in its decision and judgment, that the parole board had not acted improperly. In the plaintiff's Second Amended Complaint, the guidelines claim is set forth in Paragraph B of the Prayer for Relief, which seeks an order "[d]eclaring unconstitutional New York Executive Law § 259–i, as applied to plaintiff, a juvenile offender, and enjoining the Parole [D]efendants from using this statute as a standard by which plaintiff is consid-

ered for release on parole." Pl.'s Second Am.Compl., Prayer for Relief ¶ B, at 34. The improper-consideration-of-silence claim, meanwhile, is reflected in paragraph C of the Prayer for Relief, which seeks an order "[e]njoining the Parole [D]efendants from questioning plaintiff concerning his conviction while any further judicial challenges to that conviction are pending." *Id.* ¶ C, at 34. The defendants contend that because the New York Supreme Court, in an Article 78 proceeding, had the power to provide declaratory or injunctive relief with respect to these allegations, the inclusion of identical claims seeking declaratory or injunctive relief in the instant action is barred by res judicata. *See Fay*, 802 F.2d at 30.

The defendants also contend that res judicata bars the plaintiff's request for a declaration that § 259–i of the N.Y. Executive Law was unconstitutionally applied to him.[13] *See* Pl.'s Second Am.Compl., Prayer for Relief ¶ B, at 34. This claim was not presented at the Article 78 proceeding, although it could have been litigated in that forum. *See CE-COS Int'l*, 895 F.2d at 71 (The question of whether a statute has been applied unconstitutionally can be raised directly in an Article 78 proceeding.).

The plaintiff argues, meanwhile, that pursuant to *Patterson v. Coughlin*, 761 F.2d 886 (2d Cir.1985), *cert. denied*, 474 U.S. 1100, 106 S.Ct. 879, 88 L.Ed.2d 916 (1986), res judicata may not be applied to this case

---

**12.** As a general proposition, res judicata requires an identicality, or privity, of the plaintiffs and defendants in the initial and subsequent fora in order to apply. *See LaTrieste Restaurant and Cabaret, Inc. v. Village of Port Chester*, 40 F.3d 587, 591 (2d Cir.1994). This rule, however, is not strictly imposed where the party against whom claim preclusion is sought, in essence, has already received his or her day in court, and the application of res judicata would not alter this conclusion. *See Alpert's Newspaper Delivery, Inc. v. The New York Times Co.*, 876 F.2d 266, 270 (2d Cir.1989) (literal privity is not required in order to obtain preclusive effect); *Amalgamated Sugar Co. v. NL Indus.*, 825 F.2d 634, 640 (2d Cir.), *cert. denied*, 484 U.S. 992, 108 S.Ct. 511, 98 L.Ed.2d 511 (1987). Thus, if a subsequent party is adequately represented in the prior litigation, res judicata bars a cause of action both by parties and their privies. *See Phillips v. Kidder, Peabody & Co.* 750 F.Supp. 603, 606 (S.D.N.Y.1990). In addition, the application of res judicata would be

appropriate between officers of the same government office when the same plaintiff has sought injunctive or declaratory relief. *See Manfra v. Koch*, 666 F.Supp. 637, 640 n. 12 (S.D.N.Y. 1987), *aff'd*, 868 F.2d 1267 (2d Cir.1988).

In the instant case, the Parole and DOCS Defendants argue that privity exists sufficient to allow their use of res judicata because the same plaintiff brought the prior Article 78 proceeding against the Division of Parole and Executive Director Horn. The plaintiff does not dispute this point. Accordingly, the Court will not regard any variance between the named parties in the Article 78 proceeding and the present action to cause res judicata not to apply.

**13.** N.Y. Executive Law § 259–i sets forth several factors that the parole board is required to consider in determining whether to grant an inmate parole. *See* N.Y.Exec.Law § 259–i(2)(c) (McKinney 1993 & Supp.1996).

because no subsequent action on the part of the state may cut off the plaintiff's right to bring a § 1983 claim. *See id.* at 891. Plaintiff's argument is misplaced; for *Patterson* dealt with the issue of whether a prisoner is able to state a procedural due process claim under 42 U.S.C. § 1983 in light of the availability of a state post-deprivation remedy. The *Patterson* court concluded that a post-deprivation hearing by way of Article 78 is inadequate to meet the requirements of due process. *See Patterson,* 761 F.2d at 893. *Patterson,* however, did not address the separate question of whether, consistent with the principles embodied in the Full Faith and Credit Clause, a federal court is required to afford res judicata effect to constitutional claims seeking declaratory or injunctive relief, for which a prior judgment previously was rendered on the merits in an Article 78 proceeding. With respect to this distinct question, the Supreme Court strongly suggests that state-law principles of preclusion are unimpeded by 42 U.S.C. § 1983, because the legislative history of § 1983 fails to indicate "that Congress intended to repeal or restrict the traditional doctrines of preclusion." *Allen v. McCurry,* 449 U.S. 90, 98, 101 S.Ct. 411, 417, 66 L.Ed.2d 308 (1980).[14] Thus the plaintiff's attempt to engraft a procedural due process analysis into the res judicata inquiry is unavailing.

The more persuasive argument against the application of res judicata is presented, rather, by evaluating the materiality of the facts for which the defendants seek preclusion in the light of the state court's ultimate determination in the Article 78 proceeding. Most prominently, this Article 78 proceeding resulted in a resounding victory for Quartararo, as the court held that a *de novo* parole hearing was required. With respect to the issue of materiality, as one treatise on this subject puts it:

> In general, in order that a judgment may operate as res judicata and be conclusive evidence of a fact sought to be established by it, it must appear that the fact

was a material one in the former action, and even though a judgment in express terms professes to affirm a particular fact, yet *if such fact was immaterial, and the controversy did not turn upon it, the judgment does not conclude the parties in reference to that fact.* In other words, a gratuitous finding cannot be used to support a claim of preclusion or estoppel.

73 N.Y.Jur.2d: Judgments § 343, at 425 (1988) (emphasis added); *see Hirschberg v. Community Gen. Hosp.,* 80 A.D.2d 945, 438 N.Y.S.2d 26, 27 (3d Dep't 1981) (cause of action for conscious pain and suffering was not barred by res judicata effect of wrongful death action based on gross negligence for which plaintiff had recovered damages in previous suit, where finding by previous court that psychiatrist was a state employee at the time that decedent was admitted to the state hospital had not been necessary to the basis on which final judgment was awarded). In the Article 78 proceeding at issue, the primary issue presented was whether the parole board acted arbitrarily. Because the state court resolved this ultimate issue in favor of Quartararo, the facts and claims for which the defendants urge the application of res judicata were of little or no consequence to the outcome of the Article 78 proceeding. This conclusion likewise obtains with respect to the claim that was not brought in the Article 78 proceeding, because had it been litigated there, its disposition would not have been material to the outcome of the proceeding. Accordingly, because these claims, although arising out of the same factual grouping and transaction, were immaterial to the state court's disposition of Quartararo's Article 78 petition, the defendants may not invoke res judicata in the present action.

### B. *Collateral Estoppel*

The defendants next contend that, having had a full and fair opportunity to litigate such issues in the Article 78 proceeding, the plaintiff is barred by the doctrine of collateral estoppel from bringing suit for damages in

---

**14.** In *Allen,* the Supreme Court held that traditional principles of collateral estoppel apply to claims brought under 42 U.S.C. § 1983. In developing its analysis, however, the Supreme Court addressed the preclusion principles of collateral estoppel and res judicata interchangeably, observing that Congress did not intend to abrogate these well-established doctrines through the enactment of § 1983. *See Allen,* 449 U.S. at 98–103, 101 S.Ct. at 417–19.

the present action with respect to his claims (1) that his constitutional rights were violated by requiring him to admit guilt prior to being granted parole, and (2) that the defendants are required to utilize the internal juvenile parole guidelines in reaching their decision on whether to grant plaintiff parole. As discussed above with respect to the applicability of res judicata to plaintiff's claims for declaratory and injunctive relief, the state court in the Article 78 proceeding ruled that, with respect to each claim, the parole board had not acted improperly.

Under the doctrine of collateral estoppel, also known as issue preclusion, " 'once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case.' " *Burgos v. Hopkins*, 14 F.3d 787, 789 (2d Cir.1994) (quoting *Allen v. McCurry*, 449 U.S. 90, 94, 101 S.Ct. 411, 414, 66 L.Ed.2d 308 (1980)). "Collateral estoppel 'protects litigants from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions.' " *Remington Rand Corp. v. Amsterdam–Rotterdam Bank, N.V.*, 68 F.3d 1478, 1485 (2d Cir.1995) (quoting *Montana v. United States*, 440 U.S. 147, 153–54, 99 S.Ct. 970, 973–74, 59 L.Ed.2d 210 (1979)). As in the case of res judicata, a federal court must give a prior state court decision the same preclusive effect, for purposes of collateral estoppel, that the courts of that state would give it. *See Colon v. Coughlin*, 58 F.3d 865, 869 n. 2 (2d Cir.1995) (citing *Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 466, 102 S.Ct. 1883, 1889, 72 L.Ed.2d 262 (1982)).

Under New York law, the doctrine of collateral estoppel "only applies if (1) the issue in question was actually and necessarily decided in a prior proceeding, and (2) the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the first proceeding." *Colon*, 58 F.3d at 869 (citing *Hill v. Coca Cola Bottling Co.*, 786 F.2d 550, 552–53 (2d Cir.1986); *Kaufman v. Eli Lilly & Co.*, 65 N.Y.2d 449, 455, 492 N.Y.S.2d 584, 588, 482

N.E.2d 63, 67 (1985)); *see Burgos*, 14 F.3d at 792 (quoting *Schwartz v. Public Admin.*, 24 N.Y.2d 65, 298 N.Y.S.2d 955, 246 N.E.2d 725 (1969)). "The party asserting issue preclusion bears the burden of showing that the identical issue was previously decided, while the party against whom the doctrine is asserted bears the burden of showing the absence of a full and fair opportunity to litigate in the prior proceeding." *Colon*, 58 F.3d at 869 (citing *Kaufman*, 65 N.Y.2d at 456, 492 N.Y.S.2d at 588, 482 N.E.2d at 67).

With respect to the first requirement, the plaintiff contends that the issues necessarily decided in the Article 78 proceeding are not the same as those presented in the instant action, because in the Article 78 proceeding, the only ultimate issue that was litigated was whether the defendants acted arbitrarily in denying the plaintiff's application for parole. This ultimate issue was decided in the plaintiff's favor, and as a remedy, the court ordered the respondent to hold a *de novo* parole hearing within thirty days. *See Quartararo v. New York State Div. of Parole*, No. 45734–92, N.Y.L.J. Feb. 17, 1994, at 25 (N.Y.Sup.Ct. Jan. 31, 1994) (Pl.'s Second Am.Compl.Ex. O).

The defendants contend, on the other hand, that regardless of the resolution in favor of the plaintiff of the ultimate issue presented in the Article 78 proceeding, the fact remains that the court clearly enunciated its decision on the specific issues for which collateral estoppel is now sought. The defendants urge, therefore, that the state court's resolution of these issues in their favor warrants their preclusion, presumably because the judgment of the state court encompassed not only its ultimate determination of arbitrary conduct on the part of the parole board, but also independent determinations concerning the specific issues of (1) whether Quartararo's constitutional rights were violated by requiring him to admit guilt prior to being granted parole, and (2) whether the parole board is required to utilize the internal juvenile parole guidelines in deciding whether to grant plaintiff parole.

The defendants' contention, however, overlooks the fact that the state court's

rulings on these issues were not essential to its judgment ordering that a new parole hearing be conducted. Thus, although these issues may have actually been decided in the Article 78 proceeding, each fails to constitute an issue that was "*necessarily* decided in a prior proceeding." *Colon,* 58 F.3d at 869 (emphasis added). For an issue to be not only actually decided, but *necessarily* decided in a prior proceeding, New York law requires that such issue be "essential to the decision rendered therein." *Ryan v. New York Tel. Co.,* 62 N.Y.2d 494, 500, 478 N.Y.S.2d 823, 826, 467 N.E.2d 487, 490 (1984). As a corollary to this principle, "[in] general, the courts agree that the doctrine of collateral estoppel . . . is confined to ultimate facts, and does not extend to evidentiary facts." 73 N.Y.Jur.2d Judgments § 340, at 422 (1988); *see also 233233 Co. v. City of New York,* 171 A.D.2d 492, 567 N.Y.S.2d 411, 415 (1st Dep't 1991) (Dictum that is not essential to a court's determination is insufficient to trigger the application of collateral estoppel.). Indeed, "[a] judgment is not an estoppel as to all the litigated facts and all the evidence which a party may choose to introduce, but only as to the material facts which are in issue between the parties and necessarily bear upon, control, and are essential to the adjudication made. Conversely, a finding of fact in an earlier proceeding, even though put in issue by the pleadings, is not binding in a later proceeding, if the finding of fact was not essential to the determination of the earlier proceeding." 73 N.Y.Jur.2d Judgments § 340, at 424–25; *see Menna v. Joy,* 86 A.D.2d 138, 449 N.Y.S.2d 48, 49 (1st Dep't 1982) (On landlord's application for compensatory rent and labor cost adjustment on the basis of New York City rent control laws, a determination of the number of rooms in an apartment was not essential to a determination of the maximum rent so that the tenant was not collaterally estopped from litigating the issue of the number of rooms in a subsequent proceeding.); *City Bank Farmers Trust Co. v. Macfadden,* 13 A.D.2d 395, 216 N.Y.S.2d 215, 221–22 (1st Dep't 1961) (In a wife's action brought solely to determine her rights in a residence, judgment that a foundation established by the husband held title subject to her life estate did not bar relitigation of that court's findings that husband's transfer of assets to the foundation was fraudulent, since this fact was unnecessary to the judgment entered.), *aff'd,* 12 N.Y.2d 1035, 239 N.Y.S.2d 680, 190 N.E.2d 24, *cert. denied,* 375 U.S. 823, 84 S.Ct. 63, 11 L.Ed.2d 56 (1963). Indeed, to rule that an issue may be necessarily decided without regard to the ultimate disposition of the case would pose a substantial risk of denying a party a meaningful opportunity to litigate a specific claim. This is so because the parties generally have lower stakes in the resolution of collateral issues, and therefore less incentive to litigate such matters vigorously, by pursuing such avenues as seeking reconsideration, or review on appeal.

Applying these principles to the case at bar, it is clear that the subject rulings for which the defendants seek preclusion by collateral estoppel were not essential to the ultimate judgment of the state court. Accordingly, the doctrine of collateral estoppel may not be employed in this case. *See Tucker v. Arthur Andersen & Co.,* 646 F.2d 721, 728 (2d Cir.1981); *see also Gutierrez v. Coughlin,* 841 F.2d 484, 486 (2d Cir.1988) (per curiam) (under New York law, holding that prior adjudication of Article 78 proceeding in plaintiff's favor did not preclude relitigation of issue of due process violation in federal § 1983 action where nature of defense and liability would be different in a § 1983 proceeding). *But see Murphy v. Gallagher,* 761 F.2d 878, 882 (2d Cir.1985) ("When it is clear that the litigant was afforded his day in court, preclusive effect may be given to issues actually and fully litigated, although not technically necessary to the prior court's judgment.").

In addition, the ultimate disposition of the Article 78 proceeding in the plaintiff's favor likewise militates against a finding, under the second prong of the collateral estoppel analysis, that the plaintiff had "a full and fair opportunity to litigate in the prior proceeding." *Colon,* 58 F.3d at 869 (quoting *Kaufman,* 65 N.Y.2d at 456, 492 N.Y.S.2d at 588, 482 N.E.2d at 67). With respect to this matter, the New York Court of Appeals has enumerated the following factors to be con-

sidered in evaluating whether such an opportunity has been afforded:

> [T]he nature of the forum and the importance of the claim in the prior litigation, the incentive and initiative to litigate and the actual extent of litigation, the competence and expertise of counsel, the availability of new evidence, the differences in the applicable law and the foreseeability of future litigation.

*Ryan,* 62 N.Y.2d at 501, 478 N.Y.S.2d at 827, 467 N.E.2d at 491 (citations omitted). In view of the relative insignificance of the claims that the defendants seek to preclude in comparison to the paramount issue presented in the Article 78 proceeding of whether the parole board's determination denying parole was arbitrary, consideration of these factors impels the conclusion that the plaintiff did not have a full and fair opportunity to litigate the subject claims that he asserts in this federal action. *See Hunt v. OSR Chemicals, Inc.,* 85 A.D.2d 681, 445 N.Y.S.2d 499, 502 (2d Dep't 1981) (The relative significance of the claims involved in each forum is one of the factors bearing on the acceptable use of collateral estoppel.), *appeal denied,* 57 N.Y.2d 602, 454 N.Y.S.2d 1026, 439 N.E.2d 1245 (1982). Accordingly, the defendants' failure to succeed on this prong of the analysis likewise warrants the denial of their application to preclude specific claims on the basis of collateral estoppel.

## VI. Equal Protection Claim

The DOCS and Parole Defendants have moved to dismiss plaintiff's equal protection claim on the ground that the Second Amended Complaint fails to allege that the plaintiff was selectively treated on the basis of impermissible considerations. In the Second Amended Complaint, plaintiff alleges that he was denied equal protection of the law when the Parole and DOCS Defendants singled him out for "harsher treatment than that accorded to other similarly situated inmates who are parole applicants or work release participants." Pl.'s Second Am.Compl. ¶ 109.

To state a claim for selective application of a facially lawful state regulation, a plaintiff must allege that "(1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *LeClair v. Saunders,* 627 F.2d 606, 609–10 (2d Cir.1980), *cert. denied,* 450 U.S. 959, 101 S.Ct. 1418, 67 L.Ed.2d 383 (1981); *see FSK Drug Corp. v. Perales,* 960 F.2d 6, 10 (2d Cir.1992) (citations omitted); *see, e.g., LaTrieste Restaurant and Cabaret, Inc. v. Village of Port Chester,* 40 F.3d 587, 590 (2d Cir.1994) (village's singular application of zoning use variance and restriction to topless bar stated claim for selective enforcement) (quotations and citations omitted). In the present action, the plaintiff alleges that the actions of certain of the DOCS and Parole Defendants were motivated by a bad-faith intent to injure him, and had the effect of according him different treatment than other parole applicants, and participants in the work release program.[15]

In his Second Amended Complaint, the plaintiff sets forth allegations concerning several of the DOCS and Parole Defendants that may be construed as a manifestation of a malicious intent to injure him through his removal from the work release program, and through his denial of parole. The complaint is explicit in this regard as to the following defendants: (a) DeLuca and Callender, for their roles in, among other things, allegedly singling out the plaintiff for removal from the work release program; and (b) Hoy, Fischer, Burke, Biddle and Buchanan, in connection with their roles in the denial of the plaintiff's application for parole. In addition, as earlier discussed, the liability of the other DOCS and Parole Defendants in connection with this alleged constitutional deprivation is predicated upon their deliberate indifference to this bad-faith undertaking, and therefore is able to withstand a motion to dismiss with respect to their personal involvement. *See Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.

---

**15.** The Supreme Court's decision in *Sandin v. Conner,* —— U.S. ——, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), although razing the legal landscape for procedural due process analysis, has no implication upon equal protection claims. *See id.* at —— n. 11, 115 S.Ct. at 2302 n. 11.

1994); *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986) (citations omitted); *McCann v. Coughlin,* 698 F.2d 112, 125 (2d Cir.1983) (holding that defendant Coughlin had actual or constructive notice of unconstitutional procedures, and therefore could not escape personal responsibility). Accordingly, because the plaintiff has alleged that each of the Parole and DOCS Defendants treated him differently than other similarly situated inmates, and that such treatment was motivated by an impermissible, malicious intention to injure him, the plaintiff succeeds in pleading an equal protection claim for selective application.

## VII. Absolute Immunity Defenses

Several of the defendants in this action other than the DOCS Defendants assert personal immunity defenses based on both absolute and qualified immunity. The DOCS Defendants do not assert either an absolute or a qualified immunity defense. In addition, those Parole Defendants who did not participate in the parole release decision do not move for dismissal on personal immunity grounds.[16] The Court first will address the defendants' absolute immunity defenses, and then will analyze their claims of qualified immunity.

### A. *Immunity of Parole Defendants*

The plaintiff alleges that those Parole Defendants who participated in the parole release decision violated his constitutional rights by relying upon impermissible information in reaching their decision to deny him parole. The Parole Defendants at issue here are all parole commissioners, namely Parole Commissioners Burke, Buchanan, Levy, McNiff, Umina, Treen, Tauriello, King, and Rose [hereinafter, the "Parole Commissioners" or the "Parole Commissioner Defendants"].[17] Each of these defendant Parole Commissioners asserts that they are entitled to absolute immunity from damages for their conduct because any alleged constitutional violation stems from their performance of a quasi-adjudicative function in determining

16. In the DOCS and Parole Defendants' reply brief, it appears that counsel makes arguments on behalf of certain of the Parole Defendants who did not seek to invoke the defenses of absolute or qualified immunity in the initial brief that she submitted. Most notably, instead of referring to the subject defendants seeking relief on these grounds as the "Parole Commissioners," as counsel did in her initial brief, the reply brief employs the designation "Parole Defendants" in referring to those defendants seeking relief on these grounds. The latter category of defendants constitutes a broader category of persons than the former. To the extent that the number of Parole Defendants seeking relief on personal immunity grounds in said reply brief is broader than the number of defendants seeking such relief in counsel's initial brief, the arguments advanced for the first time in the reply brief have been disregarded by the Court for procedural defect, without prejudice to renew at a later time.

17. The plaintiff also alleges constitutional violations against the following Parole Defendants who do not move to dismiss the plaintiff's Second Amended Complaint on the basis of a personal immunity defense: (i) Paul Russi, Chairman of the New York State Department of Parole, (ii) Martin Horn, Executive Director of the New York State Department of Parole, (iii) William K. Altschuller, Director of the Appeals Unit of the New York State Department of Parole, (iv) Patrick Hoy, Area Supervisor, (v) Philip DeLuca, Senior Parole Officer, and (vi) John Callender, Senior Parole Officer.

The plaintiff does not appear to premise the liability of these defendants upon their participation in the parole release decision; rather their liability under 42 U.S.C. § 1983 is asserted on the basis of other acts unrelated to the performance of a quasi-adjudicatory role. Pursuant to the functional approach employed by the Second Circuit Court of Appeals, which regards "[f]unctional categories, rather than the status of the defendant, [to] control immunity analysis," *Sykes v. James,* 13 F.3d 515, 519 (2d Cir.1993) (citations omitted), *cert. denied,* —— U.S. ——, 114 S.Ct. 2749, 129 L.Ed.2d 867 (1994), these defendants would not be entitled to absolute immunity for those actions not directly related to the parole release decision. *See Stewart v. Lattanzi,* 832 F.2d 12, 13 (2d Cir.1987) (per curiam) (Parole officials whose actions are adjudicatory or prosecutorial in nature are entitled to absolute immunity, while parole officials who act administratively are entitled to qualified immunity.); *see also Sykes,* 13 F.3d at 519 (parole officer entitled to absolute immunity as a witness to a judicial proceeding for making allegedly perjurious statements in affidavit submitted in connection with such judicial proceeding; *Johnson v. Kelsh,* 664 F.Supp. 162, 165–66 (S.D.N.Y.1987) (function performed by parole officer in instituting parole revocation procedures was comparable to that of a prosecutor in criminal trial, thereby entitling the parole officer to absolute immunity).

whether to grant or deny the plaintiff's application for parole.

As an initial matter, the Court observes that according to paragraph 16 of the Second Amended Complaint, the Parole Commissioners are only being sued in their *official* capacities. *See* Pl.'s Second Am.Compl. ¶ 16. Both the Parole Commissioners and the plaintiff, however, have litigated the issue of these defendants' entitlement to absolute and qualified immunity as though they were being sued for money damages in their *individual* capacities as well. This is significant because "the 'personal privileges of absolute or qualified immunity are available to governmental officials only with respect to damage claims asserted against them in their individual capacities....'" *Pinaud v. County of Suffolk,* 52 F.3d 1139, 1146 (2d Cir.1995) (quoting *Ying Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir.1993)). Because the plaintiff's conduct in litigating the Parole Commissioner's entitlement to absolute or qualified immunity reflects an attempt to hold these defendants liable in their *individual* capacities, the Court—in order to provide guidance to the parties in the event this question should reappear upon a subsequent amendment to the complaint—will regard these defendants as having been sued in *both* their official and individual capacities in addressing the motions pending before the Court.

 The entitlement of a government official to absolute immunity from suit for damages depends upon the function that such official performs. "Absolute immunity is rarely granted; qualified immunity is the norm." *Dorman v. Higgins,* 821 F.2d 133 (2d Cir.1987) (citing *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985)). As the Second Circuit Court of Appeals observed in *Dorman v. Higgins,* 821 F.2d 133, 136 (2d Cir.1987), "[f]unctions most apt to be accorded absolute, rather than qualified, immunity are those integrally related to the judicial process. Two types of factors inform such a decision: [1] the need for absolute immunity in order to permit the effective performance of the function, and [2] the existence of safeguards against improper performance." *Id.* at 136.

In analyzing the first factor—which considers the need for absolute immunity in order to permit the effective performance of the function—the Second Circuit has observed that "[m]any functions intimately connected with the judicial process are characterized by a high degree of discretion in the decisions to be made, e.g., whom to prosecute, what evidence to present, what penalties to seek, what rulings to make on disputed issues, and what sanctions to impose. In such an adversary environment, emotions are likely to run high, and the party against whom any of these decisions is made is likely to feel aggrieved; further litigation would often ensue, if allowed." *Dorman,* 821 F.2d at 136 (citing *Butz v. Economou,* 438 U.S. 478, 512, 98 S.Ct. 2894, 2913, 57 L.Ed.2d 895 (1978); *Pierson v. Ray,* 386 U.S. 547, 554, 87 S.Ct. 1213, 1217, 18 L.Ed.2d 288 (1967)). "Absolute immunity in the performance of these functions is needed in order that the official not, out of fear of exposure to a civil suit for damages, be intimidated in the exercise of his discretion and the proper performance of his duties." *Id.* (citations omitted).

With respect to the second type of factor to be considered in determining whether a function should be afforded absolute immunity, a court must consider the judicial character of the function performed by the defendant official, and the presence of safeguards to "minimize the risks that unreasonable official action will occur or, if it occurs, go uncorrected." *Id.* These safeguards include: (i) the apolitical nature of the judicial or quasi-judicial decision; (ii) the role of precedent in shaping the decision at issue; (iii) the adversary nature of the process, which increases the likelihood that any significant defect will be noted and called to the impartial decisionmaker's attention; and (iv) the regularized availability of review in another forum. *See id.* at 136–37 (citing *Cleavinger v. Saxner,* 474 U.S. 193, 106 S.Ct. 496, 501, 88 L.Ed.2d 507 (1985); *Butz,* 438 U.S. at 512, 98 S.Ct. at 2913).[18]

**18.** The above-stated items mirror the six factors set forth by the Supreme Court in *Butz,* 438 U.S.

 In commenting upon these considerations, the Second Circuit Court of Appeals has observed that

> judges performing judicial functions within their jurisdictions are granted absolute immunity. *See, e.g., Pierson,* 386 U.S. at 553–55, 87 S.Ct. at 1217–18. In addition, some officials who are not judges but who "perform functions closely associated with the judicial process," *Cleavinger,* 474 U.S. at 200, 106 S.Ct. at 500, have also been accorded such immunity. These include hearing examiners employed by administrative agencies, *see Butz,* 438 U.S. at 513–17, 98 S.Ct. at 2914–16, attorneys in the course of activities "intimately associated with the judicial phase of the judicial process," *Imbler v. Pachtman,* 424 U.S. 409, 430, 96 S.Ct. 984, 995, 47 L.Ed.2d 128 (1976), and witnesses who testify in judicial proceedings, *see Briscoe v. LaHue,* 460 U.S. 325, 330–34, 103 S.Ct. 1108, 1112–13, 75 L.Ed.2d 96 (1983).

*Dorman,* 821 F.2d at 137. Absolute immunity also applies to the function performed by federal probation officers in preparing and furnishing presentence reports to the court in connection with a sentencing proceeding, as this task is "an integral part of one of the most critical phases of the judicial process." *Id.*

 Applying these considerations to the case at hand, the Court concludes that the Parole Commissioners are entitled to absolute immunity for the performance of a quasi-adjudicatory function in denying the plaintiff's application for release on parole.

With respect to the first factor—which considers the need for absolute immunity in order to permit the effective performance of the function—it is clear to the Court that in view of the high emotions that are generated, and the related likelihood of litigation that can be expected to ensue from a parole release decision where an inmate's liberty is at stake, absolute immunity is necessary to serve the public interest "in order that the official not, out of fear of exposure to a civil suit for damages, be intimidated in the exercise of his discretion and the proper performance of his duties." *Id.* at 136 (citations omitted); *see Sellars v. Procunier,* 641 F.2d 1295, 1303 (9th Cir.), *cert. denied,* 454 U.S. 1102, 102 S.Ct. 678, 70 L.Ed.2d 644 (1981).

In contrast, the Court regards the second type of factor—which analyzes the judicial character of the function performed by the defendant official and the presence of safeguards to "minimize the risks that unreasonable official action will occur or, if it occurs, go uncorrected," *Dorman,* 821 F.2d at 136—to weigh moderately against affording absolute immunity to decisions denying applications for release on parole. Analyzing the four components of this factor, the Court finds the first component to weigh in favor of absolute immunity, because although New York State parole board members are appointed by the Governor with the advice and consent of the Senate, their decisions are sufficiently removed from political influence in view of the six-year duration of their term, and the limitation upon their removal to circumstances constituting cause, after an opportunity to be heard. *See* N.Y.Exec.Law § 259–b(1) & (6) (McKinney 1993). The second component, meanwhile, is neutral because precedent plays an insubstantial role, if any, in parole release decisions.

The Court regards the third component of the second type of factor, which considers the adversary nature of the process, to weigh against the invocation of absolute immunity. The adversary nature of the forum is an important procedural safeguard, because the more adversarial the process, the more likely that any significant defect will be noted and called to the impartial decisionmaker's attention. In this regard, the forum for the making of parole release decisions is not adversarial at all. The governing statute, N.Y.Exec.Law § 259–i(2)(a), itself refers to the parole-release evaluation as an "interview," and neither the statute nor the regulations prescribe any procedures whereby a potential parolee may be represented by

---

at 512, 98 S.Ct. at 2913. Specifically, the analytical framework articulated by the Second Circuit in *Dorman* organizes the six *Butz* factors into two broad categories, with the last four *Butz* factors being subcategories of the second category of considerations, which evaluates "the existence of safeguards against improper performance." *Dorman,* 821 F.2d at 136.

counsel. N.Y.Exec.Law § 259–i(2)(a) (McKinney 1993 & Supp.1996). In addition, the rules of evidence are inapplicable, and the applicant has no right to cross-examine, to confront, or to call witnesses. *See id.* § 259–i(2); 9 NYCCRR §§ 8002.2, 8002.3 (1995).

The fourth factor, which considers the regularized availability of review in another forum, also weighs against the invocation of absolute immunity. While it is true that Article 78 of the New York Civil Practice Law & Rules permits some judicial review of parole release decisions, the scope of judicial review is extremely limited. In this regard, N.Y.Exec.Law § 259–i(5) provides that so long as they are done in accordance with law, decisions to grant or deny parole are unreviewable. *See* N.Y.Exec.Law § 259–i(5) (McKinney 1993).

As noted above, the Court finds that while the first factor weighs in favor of affording absolute immunity to parole release decisions in view of the risk of incessant litigation, the second category of factors counsels against absolute immunity in light of the relative absence of procedural safeguards that attend parole release decisions. Upon balancing these two countervailing considerations, the Court regards the first category of factor to outweigh the second and therefore militate in favor of absolute immunity.

The Court considers the degree of independent discretion that parole commissioners must exercise in determining whether to grant or deny parole to indicate strongly that the failure to accord absolute immunity to this function would disserve the overriding public interest by rendering these delicate decisions vulnerable to intimidation through the threat of litigation. There can be little dispute that the role of a parole commissioner, in deciding whether to grant or deny an inmate's application for parole, is functionally comparable to that of a judge. *See Jones v. Coughlin,* 665 F.Supp. 1040, 1046 (S.D.N.Y. 1987) (describing the parole board's decision whether to grant or deny parole as a "quasi-adjudicational function"); *cf. Vinson v. Barkley,* 646 F.Supp. 39, 41 (W.D.N.Y.1986) ("[P]arole board officials perform functionally comparable tasks to judges when they decide to grant, deny, or revoke parole."). Despite the relative absence of procedural safeguards to enhance the likelihood that an "optimal" decision will be made based upon trustworthy facts that have been filtered through the adversary process, the Court regards the risk of an unconstitutional act by one presiding at a parole hearing, in deciding whether to grant or deny parole, to be outweighed by the importance of preserving the independent judgment of these men and women. For this reason, the Court regards absolute immunity to be warranted. *See Johnson v. Kegans,* 870 F.2d 992, 997 (5th Cir.) ("The functioning of a parole board [in determining whether to grant parole] is quasi-judicial."), *cert. denied,* 492 U.S. 921, 109 S.Ct. 3250, 106 L.Ed.2d 596 (1989); *Allen v. Thompson,* 815 F.2d 1433, 1434 (11th Cir.1987) (per curiam) ("Parole decisions are the continuation of the sentencing process. . . ."); *Sellars,* 641 F.2d at 1302–03 (state parole board officials are absolutely immune from suit for actions taken when processing parole applications, because parole board officials perform functionally comparable tasks to judges when they decide to grant, deny, or revoke parole); *Jones,* 665 F.Supp. at 1046; *Stewart v. Smallwood,* No. 92 Civ. 4043 (SS), 1993 WL 77381, at *1 (S.D.N.Y. Mar. 15, 1993) ("This Court follows the great majority of legal authority that holds that parole board officials are afforded absolute immunity from civil damage awards for determinations to grant or deny parole. . . ."); *Barnes v. Rodriguez,* No. 89–CV–2624, 1990 WL 127564, at *2 (E.D.N.Y. Aug. 8, 1990), *aff'd,* 932 F.2d 956 (2d Cir.1991); *see also Conner v. Alston,* 701 F.Supp. 376, 378 (E.D.N.Y.1988) (parole officials acting in their adjudicatory functions with respect to parole revocation hearings are entitled to absolute immunity); *David v. Rodriguez,* No. 88 Civ. 2115 (JFK), 1989 WL 105804, at *2 (S.D.N.Y. Sept. 5, 1989) (same).

Moreover, the judicial character of the decision whether to grant or deny parole is underscored by section 259–i(5) of the New York Executive Law, which states that "[a]ny action by the board or by a hearing officer pursuant to this article shall be deemed a *judicial* function and shall not be reviewable if done in accordance with law." N.Y.Exec.

Law § 259–i(5) (McKinney 1993) (emphasis added). In this Court's opinion, this statutory designation is of real substance and in accordance with the nature of the task. Indeed, as the New York Court of Appeals has observed, parole release decisions are "classically judicial tasks." *Tarter v. State of New York*, 68 N.Y.2d 511, 518, 510 N.Y.S.2d 528, 531, 503 N.E.2d 84, 87 (1986) (citing *Butz*, 438 U.S. at 513–14, 98 S.Ct. at 2914–15) (other citations omitted). In determining whether to grant or deny parole,

> [t]he Board must measure the facts of a particular inmate's case against the backdrop of the guidelines. Just as a Judge performs the original sentencing function, weighing the defendant's particular situation against case law, sentencing statutes and the Judge's prior experience, the Board must fit the inmate's factual circumstances within the guidelines and use its discretion in its disposition of the matter. Both are decisions which involve the officials' expertise, an application of law and an exercise of their judgment.

*Id.* at 518–19, 510 N.Y.S.2d at 531, 503 N.E.2d at 87; *see Bacon v. Hammock*, 96 A.D.2d 557, 465 N.Y.S.2d 239, 240 (2d Dep't 1983) (discretionary decisions of the parole board as to whether parole should be granted or denied is considered a judicial function).

Finally, the plaintiff's argument that the Parole Commissioners failed to comply with the statutory criteria governing the determination of Quartararo's parole application does not diminish the adjudicatory nature of this function. The Second Circuit Court of Appeals has held that an executive official will not lose the protection of absolute immunity on the basis that the official has exceeded the scope of his or her duties under state law unless that official has proceeded "manifestly or palpably beyond his authority or performed in the clear absence of all jurisdiction." *Schloss v. Bouse*, 876 F.2d 287, 291 (2d Cir.1989) (internal quotations omitted); *see Barr v. Abrams*, 810 F.2d 358, 361 (2d Cir.1987). Although the defendant Parole Commissioners, in denying the plaintiff's application for parole, ultimately were found by the state court in an Article 78 proceeding not to have adhered to the criteria specified by statute, the "'erroneous manner in which the court's jurisdiction was exercised, however it may have affected the validity of the act, did not make the act any less a judicial act.'" *Tarter*, 68 N.Y.2d at 517–18, 510 N.Y.S.2d at 530, 503 N.E.2d at 86 (quoting *Stump v. Sparkman*, 435 U.S. 349, 359, 98 S.Ct. 1099, 1106, 55 L.Ed.2d 331 (1978)). "This is no less the case with respect to government officials who exercise quasi-judicial functions." *Id.* at 518, 510 N.Y.S.2d at 531, 503 N.E.2d at 87.

In sum, the Court concludes that in view of the judicial character of the parole release decision, absolute immunity must be accorded to this function because the risk that such decision will be affected by the threat of litigation outweighs the relative absence of procedural safeguards. Accordingly, the plaintiff's Second Amended Complaint is dismissed against the defendant Parole Commissioners on the basis of absolute immunity to the extent that the plaintiff assails their performance of the quasi-adjudicatory function of determining whether to grant or deny his application for parole.

### B. *Prosecutorial Immunity*

 District Attorney Defendants Catterson, Cohen, Miller and Jones, and Former Prosecutor Defendants Mazzei, Keahon and Byrnes move to dismiss the plaintiff's Second Amended Complaint on the basis of absolute prosecutorial immunity. The doctrine of absolute prosecutorial immunity creates a formidable obstacle for a plaintiff seeking to maintain a civil rights action against an assistant district attorney, as it provides that "prosecutors are absolutely immune from liability under § 1983 for their conduct in 'initiating a prosecution and in presenting the State's case,' insofar as that conduct is 'intimately associated with the judicial phase of the criminal process.'" *Pinaud v. County of Suffolk*, 52 F.3d 1139, 1147 (2d Cir.1995) (quoting *Burns v. Reed*, 500 U.S. 478, 486, 111 S.Ct. 1934, 1939, 114 L.Ed.2d 547 (1991); *Imbler v. Pachtman*, 424 U.S. 409, 430–31, 96 S.Ct. 984, 995, 47 L.Ed.2d 128 (1976)). Like the other absolute immunity doctrines, prosecutorial immunity reflects a policy choice between two evils; for in order to serve a broad societal interest in encouraging prosecutorial

advocacy unfettered by the threat of retaliatory litigation, *see Hill v. City of New York,* 45 F.3d 653, 656 (2d Cir.1995), this doctrine " 'leaves the genuinely wronged ... without civil redress against a prosecutor whose malicious or dishonest action deprives him of liberty.' " *Pinaud,* 52 F.3d at 1147 (quoting *Imbler,* 424 U.S. at 427, 96 S.Ct. at 993).

The existence of the prosecutorial immunity doctrine, however, does not necessarily render Quartararo's claims untenable simply because he has named individual prosecutors, including former prosecutors, as defendants. "Absolute immunity depends on 'the nature of the function performed, [and] not on the identity [or status] of the actor who performed it.' " *Pinaud,* 52 F.3d at 1147 (quoting *Forrester v. White,* 484 U.S. 219, 229, 108 S.Ct. 538, 545, 98 L.Ed.2d 555 (1988)); *see Buckley v. Fitzsimmons,* 509 U.S. 259, 268–69, 113 S.Ct. 2606, 2613, 125 L.Ed.2d 209 (1993); *Dory v. Ryan,* 25 F.3d 81, 83 (2d Cir.1994). "When a prosecutor is engaged in administrative or investigative activities, he is entitled only to qualified immunity, and thus the individual district attorney defendants in this action are to be held absolutely immune from liability under section 1983 only for acts within the scope of their duties in initiating and pursuing a criminal prosecution." *Pinaud,* 52 F.3d at 1147 (internal quotations omitted); *see Buckley,* 509 U.S. at 273, 113 S.Ct. at 2615 ("A prosecutor's administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings are not entitled to absolute immunity.") (citing *Burns v. Reed,* 500 U.S. 478, 494–96, 111 S.Ct. 1934, 1944, 114 L.Ed.2d 547 (1991)).

Relevant to this action, the question arises concerning the extent to which a prosecutor will be considered to be acting within the scope of his or her duties in pursuing a criminal prosecution after the criminal defendant has been sentenced. Generally speaking, the issue presented to the Court involves the extent to which the defendant prosecutors, and former prosecutors, may invoke absolute immunity for their actions (1) in advocating the denial of plaintiff's application for release on parole; (2) in advocating the

plaintiff's removal from the work release program; and (3) in making statements to the media with the alleged intent of harming the plaintiff.

### 1. *Advocacy of Denial of Plaintiff's Application for Parole*

"[A]bsolute immunity extends to those acts, whether in or out of the courtroom, 'which occur in the course of the prosecutor's role as an advocate for the State.' " *Pinaud,* 52 F.3d at 1148 (quoting *Buckley,* 509 U.S. at 273, 113 S.Ct. at 2615). This immunity also extends to conspiracies among prosecutors that relate to this function as an advocate. *See Dory,* 25 F.3d at 83. Accordingly, "since absolute immunity covers virtually all acts, regardless of motivation, associated with the prosecutor's function as an advocate, when the underlying activity at issue is covered by absolute immunity, the plaintiff derives no benefit from alleging a conspiracy." *Pinaud,* 52 F.3d at 1148 (internal quotations omitted); *see Dorman v. Higgins,* 821 F.2d 133, 139 (2d Cir.1987) ("[S]ince absolute immunity spares the official any scrutiny of his motives, an allegation that an act was done pursuant to a conspiracy has no greater effect than an allegation that it was done in bad faith or with malice, neither of which defeats a claim of absolute immunity."). Further, where the prosecutor engages in an activity that is intimately associated with the judicial phase of the criminal process, absolute immunity cannot be avoided on the basis that the prosecutor has exceeded the scope of his duties under state law unless the prosecutor has proceeded "manifestly or palpably beyond his authority or performed in the clear absence of all jurisdiction." *Schloss v. Bouse,* 876 F.2d 287, 291 (2d Cir.1989) (internal quotations omitted); *see Barr v. Abrams,* 810 F.2d 358, 361 (2d Cir.1987).

In his Second Amended Complaint, the plaintiff makes the following specific allegations that relate to the District Attorney Defendants' and Former Prosecutor Defendants' advocacy before the parole board:

(1) Defendants Catterson, Cohen, Jones, Mazzei, Keahon and others ... attempted to

prevent plaintiff's release on parole.... Pl.'s Second Am.Compl. ¶ 43.

(2) Defendants Catterson, Jones and Mazzei communicated false and prejudicial information ... to Parole officials for the purpose of preventing plaintiff's release on parole.... *Id.* ¶ 44.

(3) Defendants Catterson, Cohen, Jones and other unknown employees of defendant Catterson sent 8″ × 8″ color photographs of the body of John Pius to ... Parole officials in an attempt to prevent plaintiff's release on parole.... *Id.* ¶ 45.

(4) [The District Attorney Defendants in question and the Former Prosecutor Defendants in question], acting in concert with Parole and DOCS Defendants and others presently unknown, entered into an agreement to have plaintiff ... denied release on parole. *Id.* ¶ 48.

(5) Letters written by defendants Catterson and Jones dated June 14, 1990 and December 6, 1991 ... and other communications from the [District Attorney Defendants in question and the Former Prosecutor Defendants in question] ... to persons within the Division of Parole, contained references to the 1979 confession of Peter Quartararo which has been held to have been unconstitutionally obtained and unreliable. *Id.* ¶ 49.

(6) On or about January 28, 1992, defendants Catterson, Cohen, Jones and/or other unknown [District Attorney Defendants or Former Prosecutor Defendants] communicated to defendants Hoy, DeLuca, Callender and/or other Parole Defendants, a [fabricated] complaint alleging that plaintiff had threatened Barbara Pius, the mother of John Pius.... *Id.* ¶¶ 72, 79.

(7) [The District Attorney Defendants and the Former Prosecutor Defendants, among others], collectively singled out plaintiff for harsher treatment than that accorded to other similarly situated inmates who are parole applicants.... *Id.* ¶ 109.

(8) Defendant Catterson, in his capacity as the chief executive of the Suffolk County District Attorney's Office, was aware of and permitted the unlawful conduct and actions of his subordinates. *Id.* ¶ 112.

In *Pinaud v. County of Suffolk,* 52 F.3d 1139 (2d Cir.1995), the Second Circuit Court of Appeals held that an assistant district attorney was entitled to absolute immunity with respect to allegedly deceptive representations that he made to the United States Bureau of Prisons concerning the likelihood that the plaintiff's state court conviction and sentence would be reinstated on appeal. As a result of this alleged misrepresentation, the Bureau of Prisons rescinded a credit it had awarded the plaintiff for time spent in prison attributable to the state court conviction. *See id.* at 1145. According to the Second Circuit, this communication was shielded by absolute immunity because it directly related to a sentencing proceeding, *see id.* at 1149–50, and therefore constituted prosecutorial advocacy that was "'intimately associated with the judicial phase of the criminal process.'" *Id.* at 1147 (quoting *Burns v. Reed,* 500 U.S. 478, 486, 111 S.Ct. 1934, 1939, 114 L.Ed.2d 547 (1991)).

The critical issue for purposes of the present action, therefore, is whether a prosecutor's communication to a parole official concerning an inmate's application for parole should be considered a form of advocacy that is "intimately associated with the judicial [or quasi-judicial] phase of the criminal process...." *Imbler,* 424 U.S. at 430, 96 S.Ct. at 995; *see Barr,* 810 F.2d at 361. Interwoven with this issue is the related question of whether the consideration by a parole board of an inmate's application for parole is properly regarded as a judicial, or quasi-judicial, undertaking. As earlier discussed, this Court agrees with the weight of authority that regards the determination of a parole board whether to grant or deny an inmate's application for parole to constitute a quasi-judicial function. *See supra; see also Allen v. Thompson,* 815 F.2d 1433, 1434 (11th Cir. 1987) (per curiam) ("Parole decisions are the continuation of the sentencing process....").

The Second Circuit Court of Appeals has held that a prosecutor's transmission of information to parole authorities is "'intimately associated with the judicial phase of the criminal process,' and ... therefore entitled to absolute immunity." *Daloia v. Rose,* 849 F.2d 74, 75 (2d Cir.) (per curiam) (quoting

*Imbler,* 424 U.S. at 430, 96 S.Ct. at 995) (other citation omitted), *cert. denied,* 488 U.S. 898, 109 S.Ct. 242, 102 L.Ed.2d 231 (1988); *see also Johnson v. Kegans,* 870 F.2d 992, 997–98 (5th Cir.) (prosecutor has absolute immunity for letter submitted to parole board urging denial of parole in alleged retaliation for civil rights suits brought by prisoner), *cert. denied,* 492 U.S. 921, 109 S.Ct. 3250, 106 L.Ed.2d 596 (1989); *Allen v. Thompson,* 815 F.2d 1433, 1434 (11th Cir. 1987) (per curiam) (federal prosecutor who submitted information to United States Parole Commission, in response to a request from the Parole Commission for information, had absolute immunity from suit for damages); *Hrubec v. City of New York,* No. 93 Civ. 8367 (SS), 1995 WL 422023, at *3 (S.D.N.Y. July 18, 1995) (prosecutor is protected by absolute immunity in providing information to a parole board) (citations omitted). Pursuant to *Daloia,* the prosecutors in the instant case are likewise protected from suit for damages for their conduct in transmitting information to the parole board in connection with its determination whether to grant or deny the plaintiff's application for parole.[19] As the plaintiff does not suggest—nor does there appear to the Court—any principled basis to grant absolute immunity to those defendants who were employed as prosecutors at the time of their communications with the parole board, and to deny this privilege to former assistant district attorneys who prosecuted the plaintiff at his criminal trial, the Court, focusing upon the functional purpose of the communication, as opposed to the status of its purveyor, declines to draw any distinction between the two. Accordingly, the plaintiff's Second Amended Complaint is dismissed to the extent that it assails a prosecutor's, or former prosecutor's, communications to the parole board advocating against the plaintiff's release on parole.

2. *Advocacy of Plaintiff's Removal from Work Release Program*

 ▇ In his Second Amended Complaint, the plaintiff makes the following specific allegations that relate to the District Attorney Defendants' and Former Prosecutor Defendants' advocacy urging the plaintiff's removal from the work release program:

(1) Defendants Catterson, Cohen, Jones, Mazzei, Keahon and others ... attempted to prevent plaintiff's ... continued participation in work release. Pl.'s Second Am.Compl. ¶ 43.

(2) Defendants Catterson, Jones and Mazzei communicated false and prejudicial information to DOCS ... officials for the purpose of preventing plaintiff's ... continued participation in work release. *Id.* ¶ 44.

(3) Defendants Catterson, Cohen, Jones and other unknown employees of defendant Catterson sent 8″ × 10″ color photographs of the body of John Pius to DOCS ... officials in an attempt to prevent plaintiff's ... continued participation in work release. *Id.* ¶ 45.

(4) [The District Attorney Defendants in question and the Former Prosecutor Defendants in question], acting in concert with Parole and DOCS Defendants and others presently unknown, entered into an agreement to have plaintiff removed from work release.... *Id.* ¶ 48.

(5) Letters written by defendants Catterson and Jones dated June 14, 1990 and December 6, 1991 ... and other communications from the [District Attorney Defendants in question and Former Prosecutor Defendants in question] to DOCS ... contained references to the 1979 confession of Peter Quartararo which has been held to have been unconstitutionally obtained and unreliable. *Id.* ¶ 49.

(6) On or about January 28, 1992, defendants Catterson, Cohen, Jones and/or other unknown [District Attorney or Former Prosecutor Defendants] communicated to defendants Hoy, DeLuca, Callender and/or other Parole Defendants, a [fabricated] complaint alleging that plaintiff had threatened Barbara Pius, the mother of John Pius, and that

---

19. The Court notes that the New York State regulations governing parole release decision anticipate that a prosecutor will submit written comments for inclusion in an inmate's parole file and the parole board's consideration. *See* 9 NYCCRR § 8000.5(c)(2) (1995) ("to permit receipt of relevant information regarding such persons from other Federal, State and local law enforcement agencies, and Federal and State probation and judicial offices").

plaintiff should be removed from the work release program. *Id.* ¶¶ 72, 79.

(7) [The District Attorney Defendants and Former Prosecutor Defendants, among others], collectively singled out plaintiff for harsher treatment than that accorded to other similarly situated inmates who are ... work release participants. *Id.* ¶ 109.

(8) Defendant Catterson, in his capacity as the chief executive of the Suffolk County District Attorney's Office, was aware of and permitted the unlawful conduct and actions of his subordinates. *Id.* ¶ 112.

In contrast to their advocacy before the parole board, the prosecutors' advocacy concerning the plaintiff's removal from the work release program does not impress the Court as being intimately associated with the judicial, or quasi-judicial phase of the criminal process, *see Imbler,* 424 U.S. at 430, 96 S.Ct. at 995; *Barr,* 810 F.2d at 361, so as to warrant the application of absolute immunity. *See Taylor v. Kavanagh,* 640 F.2d 450, 452 (2d Cir.1981) ("[A]ctivities in which a prosecutor engages that are independent of prosecution are not protected by the doctrine of absolute immunity.") (citation omitted).

The determination whether to accord absolute immunity to the prosecutors' communications to other government officials concerning the plaintiff's removal from the work release program presents doctrinal difficulties. Foremost among these difficulties is that it is clear that, regardless of the nomenclature one wishes to attach to these communications, there can be no dispute that they are of the nature of advocacy. The Court, however, regards the absence of a quasi-judicial forum to filter these communications to militate against shielding this advocacy by absolute immunity.

In this Court's view, the Supreme Court's analysis in *Cleavinger v. Saxner,* 474 U.S. 193, 106 S.Ct. 496, 88 L.Ed.2d 507 (1985)—although arising in a different factual context—suggests that the prosecutors' advocacy concerning the plaintiff's removal from the work release program should not be protected by absolute immunity. In *Cleavinger,* former inmates of a federal prison brought an action against members of the prison's Institutional Discipline Committee alleging violations of their federal constitutional rights resulting from the committee members' errant decisions. The Supreme Court declined to accord absolute immunity to the decision-making process of the disciplinary committee. In reaching this conclusion, the Supreme Court held that it did not regard the disciplinary committee function as "a 'classic' adjudicatory one...." *Id.* at 203, 106 S.Ct. at 502. Among other things, the *Cleavinger* Court noted that the members of the committee were not "independent" in the same sense as a federal or state judge. Instead, the committee members were prison officials who were direct subordinates of the warden who reviewed their decision. *See id.* at 203–04, 106 S.Ct. at 502. Further, the requisite indicia of impartiality were absent. Rather, the Court noted:

They work with the fellow employee who lodges the charge against the inmate upon whom they sit in judgment. The credibility determination they make often is one between a co-worker and an inmate. They thus are under obvious pressure to resolve a disciplinary dispute in favor of the institution and their fellow employee. It is the old situational problem of the relationship between the keeper and the kept, a relationship that hardly is conducive to a truly adjudicatory performance.

Neither do we equate this discipline committee membership to service upon a traditional parole board. The board is a "neutral and detached" hearing body. The parole board member has been described as an impartial professional serving essentially "as an arm of the sentencing judge." And in the penalty context, the parole board is constitutionally required to provide greater due process protection than is the institution discipline committee.

*Id.* at 204, 106 S.Ct. at 502 (citations omitted). Moreover, the Court observed the absence of procedural safeguards to prevent an improvident decision:

The prisoner was to be afforded neither a lawyer nor an independent nonstaff representative. There was no right to compel the attendance of witnesses or to cross-examine. There was no right to discovery.

There was no cognizable burden of proof. No verbatim transcript was afforded. Information presented often was hearsay or self-serving. The committee members were not truly independent. In sum, the members had no identification with the judicial process of the kind and depth that has occasioned absolute immunity.

*Id.* at 206, 106 S.Ct. at 503.

This Court regards the procedures established for the determination whether to remove an inmate from a work release program to bear greater similarity to the disciplinary committee in *Cleavinger,* than to a hearing before the parole board. In reaching this conclusion, the Court recognizes that the disciplinary committee at issue in *Cleavinger* is distinguishable from the temporary release committee in this case,[20] because the temporary release committee is not necessarily required to resolve disputes between inmates and prison officials. Nevertheless, it is equally apparent, considering the factors set forth in *Dorman v. Higgins,* 821 F.2d 133, 136 (2d Cir.1987), *see supra,* that the temporary release committee at issue in this case lacks even cursory indicia of an adjudicatory body. Indeed, with respect to the initial determination of an inmate's eligibility for work release, its decision is not final, but rather is in the form of a recommendation to be reviewed by the superintendent of the prison. *See* N.Y.Correct.Law § 855(5) (McKinney 1987). In addition, (a) the members of the temporary release committee are appointed by the Commissioner of the Department of Correctional Services "to serve at the pleasure of the commissioner," *id.* § 851(11); (b) the lack of adversary procedures is pronounced, as inmates are not permitted to confront and cross-examine adverse witnesses or be represented by counsel; *see Morales v. Ward,* 89 Misc.2d 651, 392 N.Y.S.2d 197, 199 (Sup.Ct.Albany County 1977); and (c) the scope of judicial review of a decision to terminate an inmate's participation in a work release program is limited to whether the temporary release committee "violated

any statutory requirement" or whether its "determination was affected by irrationality bordering on impropriety...." *Young v. Temporary Release Comm.,* 122 A.D.2d 606, 505 N.Y.S.2d 279, 280 (4th Dep't), *appeal denied,* 68 N.Y.2d 611, 508 N.Y.S.2d 1028, 501 N.E.2d 601 (1986). Accordingly, the Court concludes that the temporary release committee charged with determining whether to remove the plaintiff from the work release program is not a quasi-adjudicatory body.

Having concluded that the temporary release committee is not a quasi-adjudicatory body, it follows that the communications made by the prosecutor defendants for the use of this committee—although undoubtedly a form of advocacy—did not constitute advocacy intimately associated with the judicial, or quasi-judicial phase of the criminal process, *see Imbler,* 424 U.S. at 430, 96 S.Ct. at 995; *Barr,* 810 F.2d at 361, so as to warrant the application of absolute immunity. Rather, in view of the absence of procedural safeguards to enhance the accuracy of the committee's determination, such prosecutorial advocacy is more appropriately characterized as "activities in which a prosecutor engages that are independent of prosecution." *Taylor,* 640 F.2d at 452 (citation omitted). Such activities are not protected by the doctrine of absolute immunity. *See id.*

In addition, as a consequence of the Court's determination that the temporary release committee is not a quasi-adjudicatory body, the prosecutor defendants' argument that they should be entitled to absolute witness immunity for providing testimony to a judicial proceeding likewise fails. *See Sykes v. James,* 13 F.3d 515, 519–21 (2d Cir.1993) (witness immunity for affiant necessary to protect the *judicial* process), *cert. denied,* —— U.S. ——, 114 S.Ct. 2749, 129 L.Ed.2d 867 (1994).

Further, the conclusion that absolute immunity does not apply with respect to the communications made by the prosecutors and former prosecutors to other government offi-

---

**20.** Pursuant to N.Y.Correct.Law § 851(9) & (11) (McKinney 1987), the temporary release committee is that body charged with the responsibility of formulating, modifying, and revoking work release programs at an institution.

cials advocating the plaintiff's removal from the work release program is consistent with the weight of authority that recognizes the " 'rare and exceptional character' " of absolute immunity, *Barrett v. United States,* 798 F.2d 565, 571 (2d Cir.1986) (quoting *Cleavinger,* 474 U.S. at 202, 106 S.Ct. at 501), and makes clear " 'that for executive officers in general, qualified immunity represents the norm.' " *Id.* (quoting *Malley v. Briggs,* 475 U.S. 335, 340, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986)). Thus, absent the necessary indicia to permit a decision by prison officials to remove an inmate from a work release program to be regarded as quasi-judicial in character, a prosecutor's advocacy before this forum is properly regarded as "administrative" in nature, and therefore not entitled to protection by absolute immunity. *See Hill v. City of New York,* 45 F.3d 653, 660 (2d Cir.1995) ("Because qualified immunity is presumed to be sufficient to protect public officials in the exercise of their discretionary duties, absolute immunity extends only so far as necessary to protect the judicial process.") (citations omitted); *Robison v. Via,* 821 F.2d 913, 919 (2d Cir.1987) (prosecutor's conduct not protected by absolute immunity because "not intimately associated with the judicial phase of the matter"); *Leibowitz v. United States,* 729 F.Supp. 556, 561 (E.D.Mich.1989) (federal prosecutor only entitled to qualified immunity with respect to claim that he conspired to place a prisoner in administrative segregation without cause, as such was unrelated to prosecutorial function), *aff'd,* 914 F.2d 256 (6th Cir.1990), *cert. denied,* 499 U.S. 963, 111 S.Ct. 1589, 113 L.Ed.2d 653 (1991).

Finally, in reaching the conclusion that prosecutorial advocacy before a parole board deserves absolute immunity, while the same advocacy before a body charged with determining whether an inmate should be removed from a work release program merits no greater than qualified immunity, the Court observes that quite aside from the judicial character of each forum, the nature of the decision to be reached within each forum holds considerable significance. Most

prominently, it impresses the Court that the decision whether to remove an inmate from a work release program does not implicate the *duration* of the sentence to be served in the same sense as a decision whether to grant or deny an inmate's application for release on parole. Rather, the Court regards the decision whether to remove a prisoner from a work release program to implicate the *terms of the prisoner's incarceration,* rather than the duration of the sentence. Indeed, a prosecutor's communications urging a prisoner's removal from work release impresses the Court as fairly analogous to prosecutorial communications recommending that an inmate be denied a furlough, or to a lesser extent, recommending that an inmate be reassigned from one prison to another. These latter categories of communications clearly relate to the terms of incarceration, and it would appear that a prosecutor's advocacy in connection with these matters constitute the performance of an administrative function. *See Pinaud,* 52 F.3d at 1150–51 (suggesting that prosecutors' role in arranging repeated transfers of defendant from county jail to county courthouse would not be covered by absolute immunity);[21] *id.* at 1151–52 (prosecutors' role in keeping defendant in state custody after the termination of all charges against him is not protected by absolute immunity); *Leibowitz,* 729 F.Supp. at 561 (prosecutor not entitled to absolute immunity with respect to his communications that caused a prisoner to be placed in administrative segregation). Accordingly, the failure of the prosecutors' advocacy concerning the plaintiff's removal from the work release program to implicate directly the duration of his sentence likewise counsels against the invocation of absolute immunity.

### 3. *Statements to the Press*

■ In his Second Amended Complaint, the plaintiff makes the following specific allegations that relate to the District Attorney Defendants' and Former Prosecutor Defendants' statements to the media with the alleged intent of harming him:

---

**21.** The Second Circuit, in *Pinaud,* did not reach the merits of this allegation on appeal, because the plaintiff voluntarily withdrew it to permit the

Court of Appeals to obtain appellate jurisdiction over a final order of the district court. *See Pinaud,* 52 F.3d at 1151.

(1) On January 7, 1992 ... *Newsday* published an article entitled "John Pius Killer on Work Release" that included statements by defendants Catterson and Mazzei as to their *opposition to the decision to place plaintiff in work release.* Pl.'s Second Am.Compl. ¶ 41.

(2) Defendants Catterson and Mazzei made public statements evincing an intent to prevent plaintiff's release on parole and continued participation in work release. *Id.* ¶ 42.

(3) On or about January 30, 1992, defendants ... Catterson, Cohen and [others] released to the news media the false allegation that plaintiff had threatened Barbara Pius [the mother of John Pius]. *Id.* ¶ 78.

(4) Defendant Catterson, in his capacity as the chief executive of the Suffolk County District Attorney's Office, was aware of and permitted the unlawful conduct and actions of his subordinates. *Id.* ¶ 112.

The Supreme Court has held that prosecutors are only entitled to qualified immunity with respect to their statements to the media concerning a criminal prosecution. *See Buckley,* 509 U.S. at 275–76, 113 S.Ct. at 2617. Although such statements may be an integral part of a prosecutor's job, "[c]omments to the media have no functional tie to the judicial process just because they are made by a prosecutor." *Id.* at 277, 113 S.Ct. at 2618; *see Martin v. Merola,* 532 F.2d·191, 195–98 (2d Cir.1976) (per curiam) (Lumbard, J., concurring). Accordingly, the defendants' statements to the media are unprotected by absolute immunity. Such conduct instead must be analyzed under the rubric of qualified immunity.

**VIII. Qualified Immunity Defenses**

■ The doctrine of qualified immunity protects government officials performing discretionary functions from suit for damages under 42 U.S.C. § 1983 "insofar as their conduct does not violate clearly established [federal] statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *see Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 2816, 86 L.Ed.2d 411 (1985) (immunity is from suit, and not merely

from liability); *Davis v. Scherer,* 468 U.S. 183, 194, 104 S.Ct. 3012, 3019, 82 L.Ed.2d 139 (1984) (for purposes of determining the availability of qualified immunity with respect to claims brought under 42 U.S.C. § 1983, the right allegedly violated must be a *federal* right, as opposed to a right created under state law). The purpose of this doctrine is to accommodate the conflicting concerns of, on the one hand, permitting an award of money damages to allow a plaintiff to vindicate his constitutional rights, and on the other hand, reducing the societal costs that attend permitting damages suits against government officers, "including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties." *Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987); *see Eng v. Coughlin,* 858 F.2d 889, 895 (2d Cir.1988). The balance struck by this doctrine requires an objective evaluation of whether a competent official would know that he or she was violating the plaintiff's federal constitutional or statutory rights. *See Anderson,* 483 U.S. at 638, 107 S.Ct. at 3038 (citing *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986)).

■ Because the conduct of the defendant officials is objectively evaluated, bare allegations of malice are insufficient to penetrate the shield that this doctrine provides to defendants who act " 'in an objectively reasonable manner.' " *Cartier v. Lussier,* 955 F.2d 841, 846 (2d Cir.1992) (quoting *Malley,* 475 U.S. at 341, 106 S.Ct. at 1096); *see Harlow,* 457 U.S. at 817–18, 102 S.Ct. at 2738. Indeed, "[s]ubjective inquiry into a government employee's motivations in acting or refusing to act has been rejected as the doctrine's test because such inquiry generally implicates questions of fact and makes it incompatible with the expressed policy that summary judgment be readily available to protect government employees from suit." *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991) (citing *Harlow,* 457 U.S. at 815–16, 102 S.Ct. at 2736–37; *Anderson,* 483 U.S. at 639–40 & n. 2, 107 S.Ct. at 3038–39 & n. 2). Further, "[u]nless the plaintiff's allegations state a claim of violation of clearly estab-

lished law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery." *Mitchell,* 472 U.S. at 526, 105 S.Ct. at 2815.

■ There are a number of ways in which a defendant official may establish a defense of qualified immunity under § 1983.

First, purely as a matter of law the defense should be sustained if the court finds that it was not clear at the time of the official acts that the interest asserted by the plaintiff was protected by a federal statute or the Constitution. . . .

Second, even if the interest asserted by the plaintiff was clearly of a type generally protected by federal law, the defendant is entitled to immunity as a matter of law if it was not clear at the time of the acts at issue that an exception did not permit those acts. . . .

Third, even if the contours of the plaintiff's federal rights and the official's permissible actions were clearly delineated at the time of the acts complained of, the defendant may enjoy qualified immunity if it was objectively reasonable for him to believe that his acts did not violate those rights.

*Robison v. Via,* 821 F.2d 913, 920–21 (2d Cir.1987).

■ The first two routes to obtaining qualified immunity consider whether the defendants violated a federal right that was clearly established at the time that the defendants acted. In general, while it is not necessary that the precise conduct in question previously have been held unlawful in order for such conduct to be objectively unreasonable, the unlawfulness of such conduct nevertheless must be evident in light of the legal rules that were clearly established at the time such conduct was taken. *See Anderson,* 483 U.S. at 639–40, 107 S.Ct. at 3038–39. In determining whether a particular right was clearly established at the time the defendants acted, a court should consider the following three factors:

(1) whether the right in question was defined with "reasonable specificity;" (2) whether the decisional law of the Supreme Court and the applicable circuit court sup-

port the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991) (citing *Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989)), *cert. denied,* 503 U.S. 962, 112 S.Ct. 1565, 118 L.Ed.2d 211 (1992). "Assertion of the privilege should be upheld unless the 'contours of the right' were 'sufficiently clear that a reasonable official would understand that what he is doing violates that right.' " *Ying Jing Gan v. City of New York,* 996 F.2d 522, 532 (2d Cir.1993) (quoting *Anderson,* 483 U.S. at 640, 107 S.Ct. at 3039); *see Kaminsky,* 929 F.2d at 925; *Eng,* 858 F.2d at 896.

■ With respect to the third route to immunity—which considers the objective reasonableness of the defendant official's conduct—and its resolution on a motion for summary judgment, the Second Circuit Court of Appeals has held that summary judgment may be granted to defendant public officials on the basis of qualified immunity " 'if they adduce sufficient uncontroverted facts that, even looking at the evidence in the light most favorable to the plaintiff[ ] and drawing all inferences favorable to the plaintiff[ ], no reasonable jury could conclude that it was objectively unreasonable for the defendants to believe that they were acting in a fashion that did not violate an established federally protected right.' " *Ying Jing Gan,* 996 F.2d at 532 (quoting *Hurlman v. Rice,* 927 F.2d 74, 78–79 (2d Cir.1991)); *Robison,* 821 F.2d at 921. It therefore follows that in the context of a motion to dismiss a complaint, if upon viewing the allegations of the complaint "in the light most favorable to the plaintiff[ ] and drawing all inferences favorable to the plaintiff[ ], [a] reasonable jury *could* conclude that it was objectively unreasonable for the defendants to believe that they were acting in a fashion that did *not* violate an established federally protected right," *Ying Jing Gan,* 996 F.2d at 532 (emphasis added) (internal quotations omitted), then the motion to dismiss must be denied.

The first inquiry in analyzing a qualified immunity claim is to determine whether the

plaintiff has alleged a violation of a federal right. *See Siegert v. Gilley*, 500 U.S. 226, 232, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991). Only if such a violation has been alleged need a court then consider whether the federal right was clearly established at the time of the defendants' actions, and if such was the case, whether it was objectively reasonable for the defendant official to believe that his conduct did not violate the plaintiff's clearly established federal rights.

In the instant action, qualified immunity defenses have been asserted by (i) the Parole Commissioner Defendants, (ii) the District Attorney Defendants, and (iii) the Former Prosecutor Defendants. Qualified immunity defenses have *not* been asserted at this juncture of the litigation by (i) the DOCS Defendants, or (ii) those Parole Defendants who did not participate in the parole release decisions (i.e., the Parole Defendants other than the Parole Commissioner Defendants). With respect to the three categories of defendants who now seek dismissal on the basis of qualified immunity, the plaintiff alleges the existence of two distinct types of clearly established rights: (1) a clearly-established federal procedural due process right with respect to the procedures employed in reviewing his application for release on parole; and (2) a clearly-established federal procedural due process right with respect to the procedures employed in removing him from the work release program. The Court will consider each of these alleged constitutional rights in turn.

A. *Alleged Constitutional Violation in connection with Procedures Employed in Denying Plaintiff's Application for Release on Parole*

 The plaintiff alleges that the Parole Commissioner Defendants violated his clearly-established federal procedural due process rights through the procedures they employed in denying his applications for release on parole. The plaintiff also alleges that the District Attorney Defendants and the Former Prosecutor Defendants violated these clearly established rights by communicating false information to the DOCS and the Parole Defendants in connection with plaintiff's

application for release on parole, including the plaintiff's unsubstantiated threat to Barbara Pius, and by making false statements to the media for the purpose of damaging the plaintiff's prospects for success in his parole application.

The Fourteenth Amendment provides in part that no State shall "deprive any person of life, liberty, or property, without due process of law...." U.S. Const. amend. XIV, § 1. This component, otherwise known as the safeguard of procedural due process, "protects 'the individual against arbitrary action of government.'" *Kentucky Dep't of Corrections v. Thompson*, 490 U.S. 454, 460, 109 S.Ct. 1904, 1908, 104 L.Ed.2d 506 (1989) (quoting *Wolff v. McDonnell*, 418 U.S. 539, 558, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935 (1974)). As the Supreme Court has explained, procedural due process questions are analyzed in two steps:

the first asks whether there exists a liberty or property interest which has been interfered with by the State, *see Board of Regents v. Roth*, 408 U.S. 564, 571, 92 S.Ct. 2701, 2706 [33 L.Ed.2d 548] (1972); the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient. *See Hewitt v. Helms*, 459 U.S. 460, 472, 103 S.Ct. 864, 871 [74 L.Ed.2d 675] (1983). The types of interests that constitute "liberty" and "property" for Fourteenth Amendment purposes are not unlimited; the interest must rise to more than "an abstract need or desire," *Board of Regents*, 408 U.S. at 577, 92 S.Ct. at 2709, and must be based on more than "a unilateral hope." *Connecticut Bd. of Pardons v. Dumschat*, 452 U.S. 458, 465, 101 S.Ct. 2460, 2464 [69 L.Ed.2d 158] (1981). Rather, an individual claiming a protected interest must have a legitimate claim of entitlement to it. Protected liberty interests may arise from two sources— "the Due Process Clause itself and the laws of the States." *Hewitt*, 459 U.S. at 466, 103 S.Ct. at 868.

*Kentucky Dep't of Corrections*, 490 U.S. at 460, 109 S.Ct. at 1908 (citation forms modified).

As a predicate to the assertion of a procedural due process violation, plaintiff contends

that the laws of the State of New York confer a liberty interest upon him with respect to the procedures governing the determination whether to grant or deny an inmate's application for parole. Specifically, plaintiff argues that the Second Circuit Court of Appeal's holding in *Boothe v. Hammock,* 605 F.2d 661 (2d Cir.1979)—that there is no constitutional right to parole in New York—is no longer good law since it was decided prior to the Supreme Court's decision in *Board of Pardons v. Allen,* 482 U.S. 369, 107 S.Ct. 2415, 96 L.Ed.2d 303 (1987). The defendants, in turn, contend that the plaintiff's argument ignores the fact that both the *Boothe* and the *Board of Pardons* decisions were decided under principles established by the Supreme Court in *Greenholtz v. Inmates of the Nebraska Penal and Correctional Complex,* 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979), wherein the Court concluded that the mandatory language and structure of the Nebraska statute at issue in *Greenholtz* created an expectation of parole protected by the Due Process Clause. *See Board of Pardons,* 482 U.S. at 373, 107 S.Ct. at 2418; *Boothe,* 605 F.2d at 663. Alternatively, the defendants contend that even assuming the existence of a liberty interest in parole release, the plaintiff fails to establish a violation of clearly established rights pursuant to *Harlow.*

In *Greenholtz v. Inmates of the Nebraska Penal and Correctional Complex,* 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979), the Nebraska parole statute at issue provided in part:

> Whenever the Board of Parole considers the release of a committed offender who is eligible for release on parole, it *shall* order his release *unless* it is of the opinion that his release should be deferred because:
> (a) There is a substantial risk that he will not conform to the conditions of parole;

(b) His release would depreciate the seriousness of his crime or promote disrespect for law;

(c) His release would have a substantially adverse effect on institutional discipline; or

(d) His continued correctional treatment, medical care, or vocational or other training in the facility will substantially enhance his capacity to lead a law-abiding life when released at a later date.

*Greenholtz,* 442 U.S. at 11, 99 S.Ct. at 2106 (quoting Neb.Rev.Stat. § 83–1,114(1) (1976)) (emphasis added). In addition, the Nebraska statute provided "a list of 14 explicit factors and one catchall factor that the [Parole] Board is obligated to consider in reaching a decision." *Id.* at 11 n. 5, 99 S.Ct. at 2106 n. 5 (citing Neb.Rev.Stat. §§ 83–1,114(2)(a)–(n) (1976)). According to the *Greenholtz* Court, the "unique structure and language" of the Nebraska provision, which featured the use of the word "shall" to create a presumption that parole release will be granted, produced "a legitimate expectation of release absent the requisite finding that one of the justifications for deferral exists."[22] *Id.* at 12, 99 S.Ct. at 2106. The *Greenholtz* Court emphasized, however, that the Nebraska provision at issue had a "unique structure and language and thus whether any other state statute provides a protectible entitlement must be decided on a case-by-case basis."[23] *Id.*

In *Board of Pardons v. Allen,* 482 U.S. 369, 107 S.Ct. 2415, 96 L.Ed.2d 303 (1987), the Supreme Court applied the principles established in *Greenholtz* in concluding that the Montana statute at issue gave rise to a constitutionally protected liberty interest protected by the Due Process Clause. *See Board of Pardons,* 482 U.S. at 381, 107 S.Ct. at 2422; *id.* at 373, 107 S.Ct. at 2418 ("To decide whether the Montana statute also

---

**22.** The *Greenholtz* Court ultimately concluded that despite the existence of a liberty interest in parole, no constitutional violation occurred because the procedures employed "adequately safeguard[ed] against serious risks of error and thus satisfie[d] due process." *Greenholtz,* 442 U.S. at 15, 99 S.Ct. at 2108.

**23.** The *Greenholtz* Court also recognized a substantial difference to exist in the nature of the interest between parole release, on the one hand, and parole revocation, on the other, noting that "[t]here is a crucial distinction between being deprived of a liberty one has, as in parole [revocation], and being denied a conditional liberty that one desires." *Greenholtz,* 442 U.S. at 9, 99 S.Ct. at 2105.

gives rise to a constitutionally protected liberty interest, we scrutinize it under the standards set forth in *Greenholtz*."). The Montana parole release statute at issue provided that "[s]ubject to ... restrictions, the board *shall* release on parole ... any person confined ... *when* in its opinion there is reasonable probability that the prisoner can be released without detriment to the prisoner or to the community ...," and specified that "parole shall be ordered ... for the best interests of society," and when the State Board of Pardons believes that the prisoner "is able and willing to fulfill the obligations of a law-abiding citizen." *Board of Pardons,* 482 U.S. at 376–77, 107 S.Ct. at 2420 (quoting Mont.Code Ann. § 46–23–201 (1985)) (emphasis added). The Supreme Court held that although, as in *Greenholtz,* the release decision at issue is " 'necessarily subjective and predictive' " and the Board's discretion " 'very broad,' " *Board of Pardons,* 482 U.S. at 381, 107 S.Ct. at 2422 (quoting *Greenholtz,* 442 U.S. at 13, 99 S.Ct. at 2107), nevertheless the Montana statute, like the Nebraska statute at issue in *Greenholtz,* "uses mandatory language ('shall') to 'create a presumption that parole release will be granted' when the designated findings are made." *Board of Pardons,* 482 U.S. at 377–78, 107 S.Ct. at 2420 (quoting *Greenholtz,* 442 U.S. at 12, 99 S.Ct. at 2106). According to the *Board of Pardons* Court, this presumption exists whether, as in *Greenholtz,* the statute mandates release "unless" the required findings are made, or whether, as in the case of the Montana statute, release is necessary "when" or "if" the required findings are made or is mandated "subject to" them. *Id.* at 378, 107 S.Ct. at 2421. Moreover, the Court regarded the "substantive predicates" of release in Montana to be similar to those in Nebraska, because each statute requires consideration of the impact of release on both the prisoner and the community, the prisoner's ability to lead a law-abiding life, and whether release will cause a "detriment to ... the community," and each statute vests the State's parole board with equivalent discretion. *Id.* at 379–80, 107 S.Ct. at 2421–22.

In 1979, shortly after the *Greenholtz* case was decided, and approximately eight years prior to the *Board of Pardons* decision, the

Second Circuit decided *Boothe v. Hammock,* 605 F.2d 661 (2d Cir.1979). In *Boothe,* the Second Circuit determined that under the principles set forth in *Greenholtz,* "New York's parole provisions, unlike Nebraska's, do not establish a scheme whereby parole shall be ordered unless specified conditions are found to exist." *Boothe,* 605 F.2d at 664. Accordingly, the *Boothe* court concluded that prisoners in New York are not entitled to federal due process protection with respect to parole release provisions which they claim not to have been observed. *See id.*

An examination of the New York State parole statutes reveals that the conclusion of the *Boothe* Court—that New York's parole provisions do not create a liberty interest in parole—is reinforced by the Supreme Court's analysis in *Board of Pardons.* Rather than giving rise to a reasonable expectancy of parole if substantive predicates have been met, the New York statute is extremely nebulous in shaping the discretion of the parole board, providing as follows:

> Discretionary release on parole shall not be granted merely as a reward for good conduct or efficient performance of duties while confined but after considering if there is a reasonable probability that, if such inmate is released, he will live and remain at liberty without violating the law, and that his release is not incompatible with the welfare of society and will not so deprecate the seriousness of his crime as to undermine respect for law.

N.Y.Exec.Law § 259–i(2)(c) (McKinney Supp.1996). In addition, the parole board is required to:

> establish written guidelines for its use in making parole decisions as required by law, including the fixing of minimum periods of imprisonment or ranges thereof for different categories of offenders.

*Id.* § 259–c(4) (McKinney 1993). Guidelines governing minimum periods of imprisonment [MPI] decisions are to include:

> (i) the seriousness of the offense with due consideration to the type of sentence, length of sentence and recommendations of the sentencing court, the district attorney, the attorney for the inmate, the pre-sen-

tence probation report as well as consideration of any mitigating and aggravating factors, and activities following arrest and prior to confinement; and (ii) prior criminal record, including the nature and pattern of offenses, adjustment to any previous probation or parole supervision and institutional confinement.

*Id.* § 259–i(1)(a) (McKinney 1993). Guidelines governing parole release decisions require consideration of:

(i) the institutional record including program goals and accomplishments, academic achievements, vocational education, training or work assignments, therapy and interpersonal relationships with staff and inmates; (ii) performance, if any, as a participant in a temporary release program; (iii) release plans including community resources, employment, education and training and support services available to the inmate; ... and (v) any statement made to the board by the crime ... victim's representative, where the crime victim is deceased....

*Id.* § 259–i(2)(c) (McKinney Supp.1996).

Unlike the Montana statute at issue in *Board of Pardons,* or the Nebraska statute at issue in *Greenholtz,* the New York statute does *not* "use[ ] mandatory language ('shall') to 'create a presumption that parole release will be granted' when the designated findings are made." *Board of Pardons,* 482 U.S. at 377–78, 107 S.Ct. at 2420 (quoting *Greenholtz,* 442 U.S. at 12, 99 S.Ct. at 2106). Perhaps in recognition of the disparity in New York's statutory language as compared to the parole statutes in Nebraska and Montana, the plaintiff instead directs the Court's attention to the language of the regulations, namely Title 9 of the New York Compilation of Codes, Rules and Regulations, Section 8002. Specifically, section 8002.3(b) states that "[r]elease *shall* be granted *unless* one or more of the following is unsatisfactory," and then enumerates three factors which the parole board is mandated to consider. 9 NYCCRR § 8002.3(b) (1995). Plaintiff's counsel, in his brief, acknowledges the limited scope of this section, however, as it applies only to situations where the guidelines for parole board decisionmaking have previ-

ously been applied to the inmate by the parole board. *See id.*

The plaintiff's construction of the system in place in New York is at odds with the construction afforded it by the New York courts. Indeed, the interpretation afforded by the New York courts underscores the substantial discretion vested in the parole board which negates the existence of a justifiable expectation of parole in a prisoner. *See Greenholtz,* 442 U.S. at 12, 99 S.Ct. at 2106 (noting relevance of state courts' interpretation of the scope of the interest). The New York courts have concluded that the parole release statute is "discretionary and holds out no more than the possibility of parole." *Russo v. New York State Bd. of Parole,* 50 N.Y.2d 69, 75, 427 N.Y.S.2d 982, 985, 405 N.E.2d 225, 227 (1980) (no liberty interest in parole release); *see Ganci v. Hammock,* 99 A.D.2d 546, 471 N.Y.S.2d 630, 632 (2d Dep't 1984) (discretionary decision of parole board not subject to judicial review if made in accordance with statutory requirements); *People ex rel. Herbert v. New York State Bd. of Parole,* 97 A.D.2d 128, 468 N.Y.S.2d 881, 883–84 (1st Dep't 1983) (noting broad discretion of parole board); *Delman v. New York State Bd. of Parole,* 93 A.D.2d 888, 461 N.Y.S.2d 406, 407 (2d Dep't 1983) (parole decision not judicially reviewable if made in accordance with statutory requirements); *Newcomb v. New York State Bd. of Parole,* 88 A.D.2d 1098, 452 N.Y.S.2d 912, 914 (3d Dep't 1982) (broad discretion of parole board), *cert. denied,* 459 U.S. 1176, 103 S.Ct. 828, 74 L.Ed.2d 1023 (1983). Accordingly, New York's parole provisions fail to confer upon inmates a legitimate expectancy of parole so as to entitle them to relief under § 1983 with respect to any alleged unfairness in their parole hearings. *See Washington v. White,* 805 F.Supp. 191, 193 (S.D.N.Y.1992). Thus, any alleged procedural deficiencies at a parole hearing solely "are matters for consideration by the state courts." *Boothe,* 605 F.2d at 665.

This Court does not regard the conclusion that New York's parole provisions fail to create a liberty interest in parole to be altered by the Supreme Court's recent decision in *Sandin v. Conner,* —— U.S. ——, 115 S.Ct.

2293, 132 L.Ed.2d 418 (1995). As discussed at length earlier in this Memorandum and Order, *see supra* Discussion, Part IV, in *Sandin,* the Supreme Court held that, although States may in certain circumstances create liberty interests which are protected by the Due Process Clause, these interests, however, generally will be "limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless *imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.*" *Sandin,* —— U.S. at ——, 115 S.Ct. at 2300 (citations omitted) (emphasis added). As previously discussed, in order for a deprivation to impose an atypical, significant hardship on the inmate relative to the ordinary incidents of prison life, it appears that a court must evaluate whether the deprivation is consistent with the prisoner's sentence, in the sense of being reasonably foreseeable therewith, and not unexpected, as opposed to working a "major disruption" in the prisoner's environment. *Id.* at ——, 115 S.Ct. at 2301. In making this evaluation, a court should proceed objectively, taking into account the duration of the prisoner's sentence, the conditions to which the prisoner is subjected, and the extent to which the alleged loss of liberty portends a departure from the circumstances faced by other "inmates in the general population." *Id.; see id.* at —— n. 9, 115 S.Ct. at 2301 n. 9 ("[W]e do not think a prisoner's subjective expectations dispositive of the liberty interest analysis, [although] it does provide some evidence that the conditions suffered were expected within the contour of the actual sentence imposed."); *supra* Discussion, Part IV. With respect to the case at bar, it appears that the absence of procedural safeguards attending a decision denying an inmate's application for parole is a type of restriction upon an inmate's freedom from restraint that "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin,* —— U.S. at ——, 115 S.Ct. at 2300.

Nevertheless, the Court regards the broad discretion that New York's parole provisions vest in the parole board to counsel strongly against the existence of a liberty interest in parole. As earlier discussed, *see supra* Discussion, Part IV, it does not appear that the majority in *Sandin* intended to depart entirely from a consideration of whether the state statute or regulation at issue is mandatory in character. While it is clear that *Sandin* rejects the drawing of negative inferences from the mandatory language of prison regulations, *see Sandin,* —— U.S. at ——, 115 S.Ct. at 2300, the Court cited with approval *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976), which distinguished the Court's prior decision in *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), noting that in *Wolff* "the protected liberty interest in good time credit had been created by state law; [in *Meachum,* in contrast], no comparable Massachusetts law stripped officials of the discretion to transfer prisoners to alternate facilities 'for whatever reason or for no reason at all.'" *Sandin,* —— U.S. at ——, 115 S.Ct. at 2297 (quoting *Meachum,* 427 U.S. at 228, 96 S.Ct. at 2540). Thus, it would appear that the methodology of *Sandin* did not seek to abandon entirely consideration of whether the state statute or regulation at issue, through its use of mandatory language and accompanying substantive predicates, served to strip officials of discretion in reaching their decision. Rather, the *Sandin* Court suggests that considerations of language remain relevant, although not of itself dispositive, and moreover that the use of negative implication jurisprudence will no longer be permitted. Accordingly, the substantial discretion that the New York parole provisions vest in the parole board, which distinguishes the New York provisions from the Nebraska and Montana parole statutes respectively at issue in the *Greenholtz* and *Board of Pardons* cases, militates against the establishment of a constitutionally protected interest in the procedures employed in New York for determining whether to grant or deny an inmate's application for release on parole. *See Orellana v. Kyle,* 65 F.3d 29, 32 (5th Cir.1995) (Although challenges to parole may give rise to liberty interest under *Sandin,* no such liberty interest was implicated in view of the language of the Texas parole statute at is-

sue), *cert. denied,* —— U.S. ——, 116 S.Ct. 736, 133 L.Ed.2d 686 (1996).

Finally, it cannot be seriously disputed that, even assuming *arguendo* the existence of a liberty interest in parole, such alleged liberty interest was by no means clearly established at the time that the defendants acted in 1992. At the time that the defendants acted, the law of the Second Circuit was that New York's parole provisions do not create any interest entitled to due process protection. *See Boothe,* 605 F.2d at 664. Moreover, even after the Supreme Court's decision in *Board of Pardons,* the district courts in this circuit continued to follow the holding of *Boothe. See, e.g., Washington v. White,* 805 F.Supp. 191, 193 (S.D.N.Y.1992). The plaintiff's suggestion that some lower courts in dictum have questioned the continued validity of *Boothe* in light of *Board of Pardons* is vastly insufficient to rise to the level of clearly established rights. Thus, at the very least, to the extent the plaintiff alleges that the defendants violated a purported liberty interest in parole, the plaintiff's argument fails because he cannot establish that any of the defendants violated a clearly established federal right. *See Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738; *Ying Jing Gan,* 996 F.2d at 532; *Jermosen,* 945 F.2d at 550.

B. *Alleged Constitutional Violation in connection with Procedures Employed in Removing the Plaintiff from the Work Release Program*

The plaintiff alleges that the District Attorney Defendants and the Former Prosecutor Defendants violated his clearly-established federal procedural due process rights attending his removal from the work release program by communicating false information to the DOCS and the Parole Defendants, including the plaintiff's unsubstantiated threat to Barbara Pius, and by making statements to the media that were designed to damage the plaintiff's ability to continue successfully in the work release program.

Proceeding with the qualified immunity analysis, the parties do not dispute that the plaintiff has a liberty interest entitling him to procedural safeguards attending his removal

from the work release program. *See Tracy v. Salamack,* 572 F.2d 393 (2d Cir.1978) (per curiam). The Second Circuit Court of Appeals has held that New York's statutory scheme governing work release creates an entitlement to continued participation in the program, *see id.* at 396 & n. 10, and that prior to an inmate's removal from a work release program, "Due Process requires [an evaluation] by the commissioner of [the] participating inmate's eligibility in the light of the threat that the inmate presents to the security of the community, taking into account his eligibility for parole, his past institutional record, the particular circumstances underlying the violent offense for which he is under sentence, and his previous temporary release record." *Id.* at 396–97 (citation omitted). "What is required is the commissioner's independent, good faith evaluation—a reviewable exercise of discretion—to take place following a *Wolff v. McDonnell* Due Process hearing which ... must be accompanied by a written statement of reasons." *Tracy,* 572 F.2d at 397 (citing *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974)).

The District Attorney Defendants and the Former Prosecutor Defendants contend, however, that they are entitled to qualified immunity with respect to the plaintiff's procedural due process claim stemming from his removal from the work release program, because the contours of this right were sufficiently unclear so that a reasonable official, confronted with the same facts and circumstances, would not understand that his conduct violated the plaintiff's constitutional rights. *See Severino v. Negron,* 996 F.2d 1439, 1442 (2d Cir.1993) (per curiam) ("Although it has been clear since *Tracy* that a liberty interest exists in a work release program, we cannot say that the boundaries of that interest are drawn with such clarity that the [DOCS] officials here knew precisely what was required to remove an inmate from the program."); *Ying Jing Gan,* 996 F.2d at 532. In addition to contesting whether the plaintiff's rights were clearly established in the fact-specific circumstances presented, these defendants also argue that the complaint should be dismissed because " 'even

looking at the evidence in the light most favorable to the plaintiff[ ] and drawing all inferences favorable to the plaintiff[ ], no reasonable jury could conclude that it was objectively unreasonable for the defendants to believe that they were acting in a fashion that did not violate an established federally protected right.'" *Ying Jing Gan*, 996 F.2d at 532 (quoting *Hurlman v. Rice*, 927 F.2d at 78–79); *Robison*, 821 F.2d at 921.

The plaintiff makes the following factual allegations in support of his contention that the District Attorney Defendants and the Former Prosecutor Defendants violated his right to constitutionally sufficient procedures prior to his removal from the work release program:

(1) Defendants Catterson and Mazzei made public statements evincing an intent to prevent plaintiff's release on parole and continued participation in work release. Pl.'s Second Am.Compl. ¶ 42.

(2) Defendants Catterson, Jones and Mazzei communicated false and prejudicial information to DOCS ... officials for the purpose of preventing plaintiff's ... continued participation in work release. *Id.* ¶ 44.

(3) Defendants Catterson, Cohen, Jones and other unknown employees of defendant Catterson sent 8″ × 10″ color photographs of the body of John Pius to DOCS ... officials in an attempt to prevent plaintiff's ... continued participation in work release. *Id.* ¶ 45.

(4) Letters written by defendants Catterson and Jones dated June 14, 1990, and December 6, 1991 ... and other communications from the [District Attorney Defendants and Former Prosecutor Defendants] to DOCS ... contained references to the 1979 confession of Peter Quartararo which has been held to have been unconstitutionally obtained and unreliable. *Id.* ¶ 49.

(5) On or about January 28, 1992, defendants Catterson, Cohen, Jones and/or other unknown [District Attorney Defendants or Former Prosecutor Defendants] communicated to defendants Hoy, DeLuca, Callender and/or other Parole Defendants, a [fabricated] complaint alleging that plaintiff had threatened Barbara Pius, the mother of John Pius, and

that plaintiff should be removed from the work release program. *Id.* ¶¶ 72, 79.

(6) On or about January 30, 1992, defendants ... Catterson, Cohen and [others] released to the news media the false allegation that plaintiff had threatened Barbara Pius. *Id.* ¶ 78.

(7) Defendant Catterson, in his capacity as the chief executive of the Suffolk County District Attorney's Office, was aware of and permitted the unlawful conduct and actions of his subordinates. *Id.* ¶ 112.

Briefly summarized, the plaintiff alleges that the wrongful acts of the District Attorney Defendants and the Former Prosecutor Defendants were of two distinct types: (1) the communication and transmission of information relevant to their advocacy that the plaintiff be removed from the work release program, including the plaintiff's unsubstantiated threat to Barbara Pius; and (2) the making of statements to the media that were designed to harm the plaintiff's prospects of participating successfully in the work release program. According to the plaintiff, viewing the allegations of the Second Amended Complaint in the light most favorable to him, a reasonable jury *could* conclude that it was objectively unreasonable for the defendants to believe that they were acting in a fashion that did *not* violate his procedural due process right to constitutionally sufficient procedures prior to his removal from the work release program, *see Ying Jing Gan*, 996 F.2d at 532, and therefore the motion to dismiss should be denied.

The plaintiff does not bring to the Court's attention any case law directing the conclusion that it is objectively unreasonable for a competent prosecutor, or former prosecutor, to believe that his communications to the media, or other government officials, would not violate a prisoner's procedural due process right attending his removal from a work release program. While the Court is mindful that it is not necessary that the precise conduct in question previously have been held unlawful in order for such conduct to be objectively unreasonable, the unlawfulness of such conduct nevertheless must be evident in light of the legal rules that were clearly established at the time that such conduct

was taken. *See Anderson,* 483 U.S. at 639–40, 107 S.Ct. at 3038–39; *Severino,* 996 F.2d at 1441–42 (quoting *Eng,* 858 F.2d at 895). Accordingly, the Court concludes that reasonable prosecutors and former prosecutors, under all of the circumstances presented except for one—which the Court shortly will discuss—could believe that they were not violating the plaintiff's federal rights by communicating information to other government officials for their use in determining whether to remove the plaintiff from the work release program. *See Severino,* 996 F.2d at 1442; *Jermosen,* 945 F.2d at 550. The Court likewise finds qualified immunity to exist—here, in all respects—in connection with these defendants' statements to the press since a reasonable prosecutor, or former prosecutor, could believe that such conduct did not violate the plaintiff's procedural due process rights attending his removal from a work release program. *See Severino,* 996 F.2d at 1442; *Ying Jing Gan,* 996 F.2d at 532.

■■■ The Court regards a closer call to be presented on the qualified immunity question with respect to defendant Catterson's communication to other government officials of the unsubstantiated complaint alleging that the plaintiff had threatened Barbara Pius, the mother of victim John Pius. *See* Pl.'s Second Am.Compl. ¶¶ 72, 79. Specifically, in paragraph 79 of the Second Amended Complaint, the plaintiff alleges as follows:

> Upon information and belief, the allegation that plaintiff threatened Barbara Pius was brought with defendant Catterson's knowledge. The allegation was fabricated for the purpose of preventing plaintiff's participation in work release or his release on parole.

*Id.* ¶ 79. This pleading impresses the Court as somewhat ambiguous. While it asserts that Catterson was aware, from the beginning, of the allegation that the plaintiff had threatened Barbara Pius, and further, that this alleged threat was fabricated for the

purpose of preventing the plaintiff's participation in work release, this pleading does *not* explicitly state that defendant Catterson *knew* that this allegation was fabricated at the time it was communicated to other government officials for the purpose of inducing the plaintiff's removal from the work release program. The Court regards the pleading's ambiguity to hold considerable significance because, in the Court's view, anything short of knowledge of the fabrication, at the time that the alleged threat was communicated to the other government officials, is *insufficient* to pierce Catterson's qualified immunity defense. In contrast, in this Court's opinion, an allegation that Catterson knew of the fabrication at the relevant time would be so egregious as to present a situation, whereby the unlawfulness of such conduct should have been evident in light of Quartararo's constitutionally protected interest attending his continued participation in the work release program.[24] *See Anderson,* 483 U.S. at 639–40, 107 S.Ct. at 3038–39.

In view of the ambiguity presented in the pleading at issue, and in recognition that the doctrine of qualified immunity shields a public official not merely from liability, but from *suit, see Mitchell,* 472 U.S. at 526, 105 S.Ct. at 2816, the Court regards it appropriate to dismiss without prejudice on qualified immunity grounds the procedural due process claim concerning plaintiff's removal from work release as against each of the District Attorney Defendants and Former Prosecutor Defendants. The plaintiff, however, is granted leave to replead this claim against these defendants, including defendant Catterson, in accordance with the analysis stated herein.

### C. Additional Matters

Finally, the plaintiff does not argue that the District Attorney Defendants or the Former Prosecutor Defendants violated any clearly-established equal protection rights. Rather, the plaintiff addresses the established nature of these rights solely with re-

---

**24.** In comparison, with respect to the defendants' statements to the media, even assuming knowledge of the fabrication at the time that such statements were made, the Court regards the relationship between the making of such statements, and the plaintiff's constitutionally protected interest attending his continued partic-

ipation in the work release program, to be too tenuous to permit the conclusion that a reasonable prosecutor, or former prosecutor, would know that he was violating established federal rights. *See Anderson,* 483 U.S. at 639–40, 107 S.Ct. at 3038–39; *Severino,* 996 F.2d at 1441–42 (quoting *Eng,* 858 F.2d at 895).

spect to the DOCS Defendants and the Parole Defendants. *See* Pl.'s Mem. of Law, at 41. Conversely, neither the District Attorney Defendants nor the Former Prosecutor Defendants specifically invoke a qualified immunity defense with respect to plaintiff's equal protection claim, although they suggest that qualified immunity provides a basis to dismiss the action against them in its entirety.

Rather than speculate whether the plaintiff still wishes to assert a federal equal protection claim, or any other claim, against the District Attorney Defendants or the Former Prosecutor Defendants, and moreover, whether these defendants would succeed in obtaining the dismissal of these claims on qualified immunity grounds, the Court will proceed by granting the plaintiff leave to file a Third Amended Complaint consistent with the Court's analysis herein. The plaintiff shall file this amended complaint within forty-five days hereof. The defendants will then be permitted to file motions to dismiss within forty-five days thereof, proceeding in accordance with the Court's individual rules governing civil motion practice.

### *CONCLUSION*

In accordance with the foregoing, the Court enters the following orders in this action:

(1) Plaintiff's Second Amended Complaint is DISMISSED against DOCS, the Division of Parole, and the New York State Commission of Correction, as barred by the Eleventh Amendment.

(2) With respect to the Eleventh Amendment implications resulting from plaintiff's bringing suit against the individual Parole Defendants in their official capacities, the parties are directed to submit a stipulation reflecting the concessions set forth in their motion papers.

(3) The plaintiff's Second Amended Complaint is DISMISSED in its entirety against defendant Byrnes for lack of personal involvement, and for failure to state a claim.

(4) The defendants' motion to dismiss plaintiff's procedural due process claim arising from his confinement without a hearing to a SHU for a period of fourteen days is GRANTED pursuant to *Sandin v. Conner,* — U.S. ——, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), although the Court further holds that such confinement nevertheless may be compensable as a manifestation of injury stemming from plaintiff's removal from the work release program without constitutionally sufficient procedures.

(5) The defendants' motion to dismiss certain of the plaintiff's claims on the basis of res judicata or collateral estoppel is DENIED.

(6) The Parole Defendants' and the DOCS Defendants' motions to dismiss plaintiff's equal protection claims are DENIED.

(7) The plaintiff's Second Amended Complaint is DISMISSED as against the defendant Parole Commissioners in their individual capacities on the basis of absolute immunity to the extent that plaintiff assails their performance of the quasi-adjudicatory function of deciding whether to grant or deny his application for release on parole.

(8) The plaintiff's Second Amended Complaint is DISMISSED as against the District Attorney Defendants and the Former Prosecutor Defendants on the basis of absolute prosecutorial immunity to the extent that the plaintiff assails their communications to the parole board advocating against the plaintiff's release on parole.

(9) The District Attorney Defendants' and the Former Prosecutor Defendants' motions to dismiss the Second Amended Complaint, on the basis of absolute prosecutorial or witness immunity, are DENIED with respect to the plaintiff's allegations concerning their advocacy that the plaintiff be removed from the work release program.

(10) The District Attorney Defendants' and the Former Prosecutor Defendants' motions to dismiss the Second Amended Complaint, on the basis of absolute prosecutorial immunity, are DENIED with respect to the plaintiff's allegations concerning their statements to the media.

(11) The Court hereby holds that New York's parole provisions do not give rise to a liberty interest in parole release, and that for purposes of qualified immunity analysis, even

assuming that such liberty interest existed, any resulting constitutional rights would not have been clearly established at the time of the acts alleged.

(12) The District Attorney Defendants' and the Former Prosecutor Defendants' motions to dismiss the plaintiff's cause of action in his Second Amended Complaint alleging that they violated his procedural due process rights attending his removal from the work release program are GRANTED in their entirety on qualified immunity grounds. The plaintiff, however, is granted leave to replead this cause of action against these defendants, including defendant Catterson, to the extent that plaintiff asserts that the defendant in question knew that the unsubstantiated complaint, alleging that the plaintiff had threatened Barbara Pius, was fabricated at the time that such allegation was communicated by that defendant to other government officials for their use in determining whether to remove the plaintiff from the work release program.

(13) The Court observes that neither the DOCS Defendants nor those Parole Defendants who did not participate in the parole release decisions have moved for dismissal on personal immunity grounds, and that this action remains pending against them.

(14) Plaintiff is granted leave to file a Third Amended Complaint, consistent with the analysis stated herein, within forty-five days of the date that this Memorandum and Order is docketed. The defendants will then be permitted to file motions to dismiss within forty-five days thereof, proceeding in accordance with the Court's individual rules governing civil motion practice.

SO ORDERED.